MIDWEST HATCHERY & POULTRY FARMS, INC., Plaintiff–Appellee,

v.

DOORENBOS POULTRY, INC., and Scott Doorenbos, Individually, Defendants–Appellants,

and

Iowa State Bank, Defendant.

No. 09–0182.

Court of Appeals of Iowa.

March 10, 2010.

Randall G. Sease, Hartley, for appellant.

David R. Johnson of Brinton, Bordwell & Johnson, Clarion, for appellees.

Considered by EISENHAUER, P.J., POTTERFIELD, J., and ZIMMER, S.J.*

ZIMMER, S.J.

Doorenbos Poultry, Inc. appeals from the district court's entry of judgment in favor of Midwest Hatchery & Poultry Farms, Inc. following a bench trial on Midwest's breach of contract claim regarding the sale of poultry. Upon our review, we affirm the decision of the district court.

## I. Background Facts & Proceedings

Doorenbos Poultry, Inc., is a company that keeps chickens for egg production, and sells the eggs. The company conducts its business at two barn facilities in Sioux County. One of the barns can house 112,000 birds and the other has a capacity of 134,000.

The evidence presented at trial reveals that hens generally do not begin laying eggs until they are seventeen or eighteen weeks old. They reach their peak production at approximately twenty-six weeks and are generally most productive in laying eggs between the ages of twenty to eighty weeks old. At about eighty weeks, the chickens molt and go through a period where they are less productive. After that, they usually continue producing eggs until they are about 110 weeks old. The practice of Doorenbos Poultry has been to keep all chickens of a single age group through their productive life, and then simultaneously replace those birds with new chickens that are seventeen to eighteen weeks old. This practice maximizes production and continues some cash flow without interruption.

Midwest Hatchery & Poultry Farms, Inc. is a producer and seller of poultry products. Midwest sells hatch eggs, baby chicks, and started pullets, which are female hens that have reached the age of laying eggs. In the fall of 2006, Doorenbos Poultry entered into a written contract with Midwest, to purchase 112,000 pullets (young hens) of the Hy–Line W–36 variety, at eighteen weeks of age, to be delivered on December 28, 2006. The contract listed a price of $1.27 per pullet, plus the cost of feed from the time of hatching to the date of delivery. The contract provided, "Deliveries are subject to availability of the Products, availability of transportation, and availability due to demand from Seller's other customers." The contract also provided, "If Seller breaches this Contract, at Seller's option, customer is entitled to either replacement or refund of the price paid by Customer."

Prior to the delivery date of December 28, 2006, Midwest notified Doorenbos Poultry it would be unable to deliver the chickens ordered on the date contemplated by the parties' contract. Doorenbos Poultry agreed to the delay, and cancelled arrangements to slaughter the approximately 110,000 chickens it had in one of its facilities at that time.

Over January 16, 17, and 18, 2007, Midwest delivered 115,581 pullets to Doorenbos Poultry. As the new chicks arrived, the old pullets were moved out. Scott Doorenbos, the president of Doorenbos Poultry, thought the new chickens looked small. Because of his concerns, he had two of the delivery trucks weighed before the pullets were unloaded. Doorenbos concluded the birds delivered were thirteen to fourteen weeks of age rather than eighteen weeks. Doorenbos testified he could not cancel the order and return the chickens because his former flock had already been removed. He explained that the barns in which the chickens are kept do not have heating. Because the build-

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2009).

ings maintain their temperature from the body heat of the birds, Doorenbos believed the water lines in the barn would have frozen if he had not kept the pullets. Doorenbos testified the pullets delivered by Midwest did not start laying eggs until February 18, 2007. From the time the pullets were delivered and the existing flock was removed until the pullets reached their "laying" phase, Doorenbos Poultry incurred feeding and other maintenance costs for the pullets with no egg production to generate revenue.

The record reflects that the pullets delivered by Midwest ultimately met or exceeded industry standards. The Hy–Line Management Guide establishes the recommended and average feed amounts and average production figures for the W–36 variety of pullets during the laying period of eighteen to eighty weeks and the post-molt period, which stops in the guide at the age of 110 weeks. When this case was tried to the court in late September 2008, Doorenbos Poultry had kept the pullets delivered by Midwest in production through 117 weeks and was intending to keep them in production until at least 119 weeks.

On January 20, 2007, Midwest sent Doorenbos Poultry an invoice for $267,916.76, which represented $146,787.87 for the cost of 115,581 pullets, $112,460.31 for feed, and $8668.58 for vaccine. Doorenbos Poultry did not pay for the birds Midwest delivered when it received the invoice. Doorenbos Poultry contacted Midwest within thirty days after the pullets were delivered and complained that it had not received chickens that were eighteen weeks old, as specified in the contract. Because it believed the chickens were younger than eighteen weeks, Door-

enbos Poultry sought a reduction in the contract price. It stated it lost income while the chickens were not mature enough to lay eggs. Doorenbos Poultry did not seek to have any of the pullets replaced. The parties never resolved their differences.

In August 2007, approximately seven months after the pullets were delivered, Midwest advised Doorenbos Poultry that it wanted to come and pick up the pullets if payment was not made. Doorenbos Poultry was not interested in returning the birds, and its unwillingness to return any chickens to Midwest was conveyed to Midwest by Doorenbos Poultry's attorney. On August 19, 2007, Doorenbos Poultry sent Midwest a check for $184,135.18, which was what it believed should have been the cost for the younger pullets. Doorenbos Poultry never returned any chickens to Midwest.

On September 14, 2007, Midwest filed an action for a money judgment alleging breach of contract and sought foreclosure of a purchase money security interest against Doorenbos Poultry, Scott Doorenbos individually, and Iowa State Bank.[1] Doorenbos Poultry responded with a counterclaim alleging breach of contract by Midwest. The parties waived their right to a jury trial, and their case was eventually tried to the court.

In a decision filed January 9, 2009, the district court determined this action was governed by the Uniform Commercial Code (UCC). *See* Iowa Code ch. 554 (2007). The court found that under section 554.2709(1)(a), "[b]ecause Doorenbos accepted and kept the pullets, Midwest is entitled to the unpaid balance of the contract price." The court found Doorenbos

---

1. The district court granted Iowa State Bank's motion for summary judgment. The court found Iowa State Bank had a first prior-ity lien on the collateral which was the subject of the petition for foreclosure.

Poultry was liable for the full amount billed by Midwest Hatchery, meaning it still owed $83,781.58 for the pullets that were delivered.

The court also concluded that Doorenbos Poultry's acceptance of the pullets did not preclude its breach of contract claim against Midwest. *See* Iowa Code § 554.2714. After considering Doorenbos Poultry's counterclaim, the court found Midwest had breached the contract by providing pullets that were not of the specified age. The district court concluded that about eighty percent of the pullets were three weeks too young, and about twenty percent were four weeks too young. The court found that the limitation of damages clause in the parties' contract failed in its essential purpose. *See* Iowa Code § 554.2719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.") The court determined Doorenbos Poultry had lost profits of $31,732.79 because it was not able to replace its existing flock with eighteen-week-old birds. The court set off the amount of the loss against the balance Doorenbos Poultry still owed Midwest and entered judgment against Doorenbos Poultry for $52,048.79 ($83,781.58 minus $31,732.79). The claim against Scott Doorenbos individually was dismissed.

Under the parties' contract, Midwest could recover attorney fees. Midwest submitted a claim for attorney fees in the total amount of $8660.47. The court ordered Doorenbos Poultry to pay $3000 of the fees requested.

Doorenbos Poultry has appealed from the decision of the district court. It contends: (1) the trial court erred in awarding Midwest any damages because Midwest is barred from receiving damages; (2) the trial court erred in awarding Midwest attorney's fees; (3) the trial court erred in finding that the limited and exclusive remedy outlined in the contract failed of its essential purpose; and (4) in the alternative, if the limitation of remedy did fail of its essential purpose, then the trial court improperly calculated damages. Midwest has not filed a cross-appeal.

## II. Standard of Review

This case was tried at law, and our review is for the correction of errors at law. Iowa R.App. P. 6.907 (2009). The district court's findings of fact are binding on appeal if they are supported by substantial evidence. Iowa R.App. P. 6.904(3)(*a*). We are not bound, however, by the court's legal conclusions. *Land O'Lakes, Inc. v. Hanig,* 610 N.W.2d 518, 522 (Iowa 2000).

## III. Breach of Contract

Doorenbos Poultry first contends Midwest is barred from any recovery under the contract because Midwest did not perform a material condition of the contract. Doorenbos Poultry points out that the contract specifically called for eighteen-week-old pullets and there is no dispute that Midwest delivered pullets that were less than eighteen weeks old. In support of its argument, Doorenbos Poultry relies upon *Taylor Enterprise, Inc. v. Clarinda Production Credit Ass'n,* 447 N.W.2d 113, 116 (Iowa 1989), which held, "A material condition which is agreed to by the parties must be fulfilled by the party bringing suit in order for such party to recover on the contract." Doorenbos Poultry argues that it is entitled to a refund from Midwest of $184,135.18, the entire amount it paid Midwest, because Midwest did not deliver pullets that were the correct age.[2] For the reasons which follow, we disagree.

---

2. If this argument is accepted, Doorenbos Poultry would pay nothing for the more than

■ The UCC applies to the sale of goods. Iowa Code § 554.2102. The sale of livestock is included in the sale of goods. *Flanagan v. Consolidated Nutrition, L.C.*, 627 N.W.2d 573, 577 (Iowa Ct.App.2001) (finding the definition of "goods" encompasses livestock). Therefore, the provisions of the UCC apply to the contract between the parties for the sale of pullets.

Article 2 of the UCC "relaxes many of the legal formalisms and technicalities of contract formation associated with the common law of contracts." *Id.* at 578. Under the UCC, section 554.2607 provides, "The buyer must pay at the contract rate for any goods accepted." A buyer accepts goods when the buyer "take[s] or retain[s] them in spite of their nonconformity." Iowa Code § 554.2606(1)(a). A buyer also accepts goods if the buyer "does any act inconsistent with the seller's ownership." *Id.* § 554.2606(1)(c).

■ We conclude the rule in *Taylor Enterprise*, relied upon by Doorenbos Poultry, is not applicable to the factual circumstances of this case, which is governed by the UCC.[3] Under the UCC, if a buyer accepts goods, despite their nonconformity to the specifications of the contract, the buyer must pay the contract rate for the goods accepted. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 8–2, at 307 (5th ed. 1995).

■ We determine there is substantial evidence in the record to support the finding of the district court that Doorenbos Poultry accepted the chickens delivered by Midwest within the meaning of section 554.2606, despite their nonconformity. Scott Doorenbos testified:

> Q. Why on the delivery of the birds, then, did you not just cancel the order?
> A. Once my birds are out of the barn and the new birds are in there, you don't cancel the order. I mean, I couldn't. I don't think he would have taken the birds back. I mean, that's hard moving once, and then my water lines would freeze. It's—it's not impossible, but you don't go and do that once you start moving birds in and bringing birds out.

Scott Doorenbos testified Doorenbos Poultry still had the chickens delivered by Midwest Hatchery at the time of the trial on September 23, 2008. Under section 554.2607, we find no error in the district court's conclusion that Doorenbos Poultry must pay the contract rate for the pullets it accepted and then used throughout their productive life.

## IV. Limitation of Remedies Provision

The parties' contract contained a limitation of remedies provision. In particular, the contract provided that, at the option of Midwest, Doorenbos Poultry was entitled to either replacement of the pullets or refund of the purchase price if Midwest breached the contract. The trial court determined that the limited remedies provision failed of its essential purpose and then awarded Doorenbos Poultry damages on its counterclaim based on its loss of production and profits.

On appeal, Doorenbos Poultry argues that the trial court erred in concluding the limitation of remedies provision failed of

---

115,000 pullets it accepted and then used for egg production during the entire productive life of the birds.

3. We also note that under the common law a party's acceptance and retention of services with knowledge of the nonoccurrence of a condition of the contract by the other party, operates as a promise to perform despite the nonoccurrence of the condition. *See Agri Careers, Inc. v. Jepsen*, 463 N.W.2d 93, 96 (Iowa Ct.App.1990) (citing Restatement (Second) of Contracts § 246(1), at 261 (1981)).

its essential purpose. It contends that Midwest had the opportunity to replace the pullets delivered or refund the purchase price paid by Doorenbos Poultry when Midwest was notified of its breach, and instead chose to do neither. According to Doorenbos Poultry, Midwest is not entitled to recover anything under the contract because it did not follow through with the contracted-for limited remedy. Doorenbos Poultry argues that the proper remedy under the contract is a refund of the entire $184,135.18 payment which Doorenbos Poultry made to Midwest. If we find that the trial court was correct in determining that the limitation of remedies provision failed, then Doorenbos Poultry advances the alternative argument that the trial court improperly calculated its damages.

■ Before we begin our discussion of the limited remedy issue, we believe it is appropriate to express our agreement with the district court's conclusion that the acceptance of the nonconforming goods by Doorenbos Poultry did not preclude its counterclaim for breach of contract against Midwest. There is no dispute on appeal that Midwest breached the contract by providing nonconforming chickens. Section 554.2607(2) states, "acceptance does not of itself impair any other remedy provided by this Article for nonconformity." [4] Also, section 554.2714(1) provides:

> Where the buyer has accepted goods and given notification (subsection 3 of section 554.2607) the buyer may recover as damages for any nonconformity of tender the loss resulting in the ordinary

course of events from the seller's breach as determined in any manner which is reasonable.

Clearly, acceptance of the pullets does not preclude Doorenbos Poultry from asserting a claim based on breach of contract by Midwest. We now turn to the arguments concerning the limited remedies provision in the parties' contract.

Under the UCC, the parties to a contract may agree to limit the remedies available if the seller breaches the contract by providing nonconforming goods, as follows:

> [T]he agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts.

Iowa Code § 554.2719(1)(a). In this case, the parties' contract specifically provided, "If Seller breaches this Contract, at Seller's option, customer is entitled to either replacement or refund of the price paid by Customer."

■ Section 554.2719(2) provides, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter." A remedy's essential purpose "is to give to a buyer what the seller promised him." *Hartzell v. Justus Co., Inc.*, 693 F.2d 770, 774 (8th Cir.1982). The focus of analysis "is not whether the

---

4. Where a tender of goods has been accepted, a buyer must notify a seller "within a reasonable time" of any breach by the seller, or be barred from any remedy. Iowa Code § 554.2607(3)(a). The parties' contract provided the purchaser was required to inform Midwest Hatchery of any suspected problems within thirty days from the date of delivery.

*See id.* § 554.1204(1) ("Whenever this chapter requires any action to be taken within a reasonable time, any time which is not manifestly unreasonably may be fixed by agreement."). Scott Doorenbos telephoned Midwest Hatchery and expressed his concern about the size of the pullets within thirty days of the delivery.

remedy compensates for all damage that occurred, but that the buyer is provided with the product as seller promised." *Brunsman v. DeKalb Swine Breeders, Inc.,* 952 F.Supp. 628, 635 (N.D.Iowa 1996); *Nelson v. DeKalb Swine Breeders, Inc.,* 952 F.Supp. 622, 628 (N.D.Iowa 1996).

■ Where repair or replacement can give the buyer what is bargained for, a limitation of remedies does not fail of its essential purpose. *Badgett Constr. & Dev. Co. v. Kan–Build, Inc.,* 102 F.Supp.2d 1098, 1105 (S.D.Iowa 2000). In other circumstances, however, repair or replacement is not sufficient, and then a court may find the remedy failed of its essential purpose. *See Select Pork, Inc. v. Babcock Swine, Inc.,* 640 F.2d 147, 150 (8th Cir. 1981) (finding a limitation of remedies provision failed of its essential purpose when sellers did not deliver special pigs as described in a contract; the court found the limitation of remedies provision would have applied only if the special pigs had been delivered).

In this case, the district court determined the limitation of remedies provision in the parties' contract failed in its essential purpose, citing *Select Pork.* The court found that under the limited remedies provision, at Midwest's option, Doorenbos Poultry was entitled to either replacement of the pullets or a refund of the purchase price. The court further found that Midwest could have exercised this option at the time Scott Doorenbos notified Midwest of his concerns regarding the weight of the pullets soon after they were delivered. The court went on to conclude that the essential purpose of the contract was the delivery of eighteen-week-old pullets. The court noted that, at the time of trial, it was impractical for Midwest to replace the entire flock or refund the purchase price. The court rejected Midwest's argument that Doorenbos Poultry was entitled to a refund of only about $9000 based on the "grow" portion of the unit price of the chickens.[5] The court concluded the limited remedy failed because "Doorenbos in this case did not receive 18–week–old pullets as promised, and a partial refund of the grow' portion of the contract price does not give Doorenbos what Midwest promised."

On appeal, Doorenbos Poultry admits the chickens could not have been replaced at the time of trial, but points out that they could have been replaced at the time Scott Doorenbos contacted Midwest and expressed his concern about the size of the pullets. Doorenbos Poultry argues that the replacement remedy would not have failed of its essential purpose if it had occurred at the time of notification. Doorenbos Poultry contends that because the chickens cannot now be replaced, the only option available under the contract is to have Midwest refund the entire balance of the purchase price. Doorenbos Poultry concedes this remedy is harsh, but argues that it is appropriate under the terms of the contract.

■ Upon our review of the record, we agree with the district court's ultimate conclusion that the limited remedy provision of the parties' contract failed of its essential purpose. The chickens were delivered over January 16, 17, and 18, 2007. Doorenbos Poultry notified Midwest that the pullets were not as specified in the contract within thirty days after delivery. We agree with the trial court's conclusion that the reference to a replacement or

---

**5.** The record reveals the grow fee portion of the unit price is separate from the cost of feed and encompasses other grow costs such as the cost for buildings, labor, and other maintenance costs.

refund in the contract contemplates the entire sale with Midwest taking back the entire flock of birds.

At the time Scott Doorenbos informed Midwest that the pullets delivered were not eighteen weeks old, it is clear that Doorenbos Poultry was not interested in having the pullets replaced, and Midwest made no offer to replace them. When it was notified of the breach, we agree that Midwest could have exercised its option under the contract, taken back the entire flock, and either replaced the chickens with eighteen week old pullets or refunded the entire purchase price. The record supports the conclusion that this did not happen because, as the district court noted, it was plainly impractical.

It would have been extremely inefficient for both parties to replace the pullets Midwest had delivered. The pullets that Doorenbos Poultry had in its barn would have had to have been rounded up, placed in cages, and loaded into trucks while more that 100,000 replacement birds were moved into the barn.[6] As Scott Doorenbos testified, a simultaneous exchange would have been necessary because the birds provided the only source of heat for the barn. In addition, it does not appear that either party was interested in the option of removal and refund.

The record also supports the trial court's conclusion that replacement or refund was not practical at the time of trial. By that time, the chickens had reached the end of their productive life and were about

to be rendered. As a result, replacement was no longer possible.

Under the circumstance presented here, we conclude the district court did not err in concluding the limitation of remedies provision in the parties' contract failed in its essential purpose. We next consider Doorenbos Poultry's alternative claim that the trial court improperly calculated its damages.

## V. Amount of Damages

 Because the limitation of remedies provision failed in its essential purpose, a consideration of damages reverts to section 554.2714(1), which provides for the recovery of damages for "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Thus, any manner that is reasonable may be used to determine a buyer's damages for nonconforming goods. *Flom v. Stahly,* 569 N.W.2d 135, 142 (Iowa 1997). Here, the district court found "a loss of profits would have been an expected loss resulting in the ordinary course of events from the nonconformity of the pullets delivered by Midwest under § 554.2714(1)."[7]

Under section 554.2714(2), damages are measured by the difference between the value of the goods at the time of acceptance, and their value if they had been as specified in the contract, "unless special circumstances show proximate damages of a different amount." The court noted that neither party submitted any evidence as to the value of fourteen- or fifteen-week-old

---

**6.** The record does not disclose how long it would have taken to secure, transport, and replace more than 100,000 pullets with new pullets that were exactly eighteen weeks old.

**7.** Midwest Hatchery asks to have the amount of damages awarded to Doorenbos Poultry on its counterclaim reduced to $9480.94. It states Doorenbos Poultry should be entitled to

be reimbursed for its losses, but not lost profits. It calculates losses to include building payments, electricity, water, and labor. We note that Midwest Hatchery did not appeal or cross-appeal the decision of the district court. Therefore, it is entitled to no greater relief than it was accorded in the district court. *See Federal Land Bank v. Dunkelberger,* 499 N.W.2d 305, 308 (Iowa Ct.App.1993).

pullets and expressed skepticism that there would be any recognized value for pullets that were between fourteen and fifteen weeks old and did not have the ability to lay eggs. As a result, the court concluded the "special circumstances" provision of section 554.2714(2) should apply.

■ At trial, Doorenbos Poultry calculated its lost profits by calculating the revenues it would have received from its existing flock of approximately 100,000 birds over a five week period if the flock had not been removed to make room for the pullets delivered by Midwest. Doorenbos Poultry presented evidence the feed costs and miscellaneous expenses for the chickens for five weeks was $65,564.82, and its lost revenues for five weeks were $115,147. After carefully considering the evidence presented, the district court concluded that eighty percent of the chickens were three weeks too young, and the feeding costs and lost revenues for those birds would have been sixty percent of the amount claimed by Doorenbos Poultry. Similarly, the court concluded that the feed costs and lost revenues for the chickens four weeks too young would have been eighty percent of the amount claimed by Doorenbos Poultry. The court calculated these pro-rated amounts and arrived at the total of $31,732.79 for the damages to be awarded Doorenbos Poultry on its counterclaim.

Doorenbos Poultry first asserts Midwest Hatchery charged the wrong amount for feeding the pullets on the invoice. It claims the actual amount for feeding pullets for fourteen weeks would be $86,027, not $112,460.31 as shown on the invoice. Jack Malmgren, a salesman for Midwest, testified the amount charged by Midwest for feed costs represented the actual costs incurred by Midwest in feeding the chickens delivered to Doorenbos Poultry. Malmgren stated Midwest kept records of the feed used. The district court determined Malmgren's testimony was credible. We conclude there is substantial evidence in the record to support the district court's conclusion that the amount charged for feed on the invoice, $112,460.31, was accurate. Accordingly, we reject this assignment of error.

Doorenbos Poultry also asserts the district court incorrectly found it was claiming $115,147 as lost revenue for five weeks from its existing flock. It contends this amount represents the actual losses incurred by removing the existing flock of chickens for the immature birds it received. Doorenbos Poultry states the court should have considered the loss to the facility over the production life of the flock. It states that taking the average production of the chickens over their productive life and calculating that for 112,000 chickens for three to four weeks would be $159,706. Applying the district court's formula to this amount would result in damages of $60,250.36 instead of $31,732.79.

We determine Doorenbos Poultry's proposed calculation of damages does not represent their actual losses. As the district court pointed out, "[t]he breach by Midwest is based upon the age of the birds delivered in comparison to 18 weeks, not the number of weeks that occurred after delivery before the pullets began laying eggs." Midwest did not warrant a specific production, it warranted that the pullets would be eighteen weeks of age. Scott Doorenbos testified Doorenbos Poultry lost $115,147 by moving the previous flock out before the new flock was ready to lay eggs. We determine there is substantial evidence in the record to support the district court's award of damages.

## VI. Trial Attorney Fees

Doorenbos Poultry claims the district court erred in awarding attorney fees to

Midwest because Midwest is barred from recovering damages. Doorenbos Poultry's argument on this issue is based on its claim above that under *Taylor Enterprise,* 447 N.W.2d at 116, Midwest cannot pursue its claim because it breached the contract. We have already determined that under the UCC Midwest could seek payment from Doorenbos Poultry within the terms of the contract. We conclude the court properly awarded attorney fees that were permitted under the contract.

### VII. Appellate Attorney Fees

Midwest seeks attorney fees for this appeal in the amount of $7500. The parties' contract provides for the payment of attorney fees and expenses incurred in collecting indebtedness due under the contract. Attorney fees may be awarded under section 625.22 where "judgment is recovered upon a written contract containing an agreement to pay an attorney's fee." *FNBC Iowa, Inc. v. Jennessey Group, L.L.C.,* 759 N.W.2d 808, 810 (Iowa Ct.App. 2008). We determine the amount of appellate attorney fees should be determined in the district court, and remand on this issue.

We affirm the decision of the district court. We remand for calculation of appellate attorney fees under the parties' contract. Costs of this appeal are assessed to Doorenbos Poultry.

**AFFIRMED AND REMANDED.**