## IN THE COURT OF APPEALS OF IOWA

No. 17-1040
Filed April 4, 2018

IN RE THE MARRIAGE OF SOMMER D. JACOBSON
AND JEFFREY N. JACOBSON

Upon the Petition of
SOMMER D. JACOBSON n/k/a WASSER,
        Petitioner-Appellant,

And Concerning
JEFFREY N. JACOBSON,
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Scott County, Marlita A. Greve,

Judge.


        Appeal from ruling granting petition to modify dissolution decree and from

ruling granting contempt applications. **MODIFICATION AFFIRMED. CONTEMPT**

**CITATIONS AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


        Michael J. McCarthy of McCarthy, Lammers & Hines, Davenport, for

appellant.

        Catherine Z. Cartee and Chase A. Cartee of Cartee Law Firm, P.C.,

Davenport, for appellee.


        Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**MCDONALD, Judge.**

Following a contested trial, Jeffrey Jacobson and Sommer Wasser f/k/a Jacobson divorced in May 2015. The district court granted the parties joint legal custody of their child N.J. (born 2009), granted Sommer physical care of the child, and granted Jeffrey visitation. In April 2016, Jeffrey filed an application to modify the parties' decree, seeking physical care of the child. While the modification action was pending, Jeffrey filed four separate contempt applications against Sommer. In January 2017, Sommer's husband Steve obtained employment in Virginia, and Sommer gave Jeffery twelve days' notice she was moving with the child from the Quad Cities to Virginia. On Jeffrey's motion, the district court enjoined Sommer from taking the child to Virginia while this action was pending. Subsequently, the modification action and contempt applications came on for trial. The district court found a material and substantial change in circumstances and granted Jeffrey physical care of N.J. The court found Sommer in contempt on several grounds. Sommer timely filed this appeal, contending Jeffrey failed to prove the grounds warranting modification of the decree and failed to prove the grounds for contempt.

I.

"Petitions to modify the physical care provisions of a divorce decree lie in equity." *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). Although our review is de novo, *see* Iowa R. App. P. 6.907, we afford deference to the district court for reasons both institutional and pragmatic. *See Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017). In particular, "[a]lthough we make our own findings of fact, when considering the credibility of witnesses, the court gives

weight to the findings of the trial court even though we are not bound by them."
*Hoffman*, 867 N.W.2d at 32.

As the party seeking modification of the  decree, it was Jeffrey's burden to prove grounds warranting modification.  *See id.*  This is a significant burden:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change.  The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary.  They must relate to the welfare of the children.  A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being.

*Id.*  When evaluating whether the constellation of circumstances justifies modification of the decree, our polestar is whether modification is in the best interest of the child.  *See id.*

One relevant, but not dispositive, point of light is Sommer's decision to move with her current spouse and their newborn child from the Quad Cities area to Virginia.  Sommer made the decision without consulting Jeffrey and informed Jeffrey of the decision only twelve days prior to the proposed move.  Where, as here, joint custodial parents disagree on whether the child's residence should be changed, "the parent having physical care of the child[] must, as between the parties, have the final say concerning where [the child's] home will be."  *In re Marriage of Frederici*, 338 N.W.2d 156, 159 (Iowa 1983).  This decision-making authority is implicit "in the right and responsibility to provide the principal home for the child[]."  *Id.*  While the parent with physical care of the child has the authority to make the decision regarding the child's residence, the authority "is not

unlimited." *Hoffman*, 867 N.W.2d at 33. Our supreme court has recognized that "[a] decision by a joint custodial parent with physical care of [a] minor child[] to change residences is the kind of decision the other joint custodian has a right to be consulted about." *Id.* at 32. The failure of the relocating parent to consult the other parent regarding the proposed move is contrary to the relocating parent's duty as a joint legal custodian and reflects negatively on the relocating parent. *See In re Marriage of Mayfield*, 577 N.W.2d 872, 874 (Iowa Ct. App.1998) (concluding one parent's decision to move "should not have been made without [the other parent]'s input," and considering the lack of communication "adverse to [the moving parent's] position"). In addition, the relocating parent's decision is "subject to judicial review based on well-established principles protecting the best interest of the child." *Hoffman*, 867 N.W.2d at 33.

The facts and circumstances surrounding Sommer's proposed move to Virginia illuminate the legally significant issue in this case: since the time of the decree, Sommer has persistently, maliciously interfered with Jeffrey's visitation and relationship with N.J. Jeffrey filed this modification action in April 2016 for this reason, more than eight months prior to the time Sommer informed Jeffrey of the proposed move. Thus, although Sommer contends this is merely a relocation case in which the parent with physical care should maintain physical care, it is not such a case. The central issue in this case was and is the mother's attempt to marginalize the father in the child's life. When understood in this light, we agree with the district court that the level of interference and conflict in this case rises far above the level present in the typical case and is sufficient to establish a material and substantial change in circumstances. *See In re Marriage of Grantham*, 698

N.W.2d 140, 146 (Iowa 2005) (concluding circumstances had substantially changed where "[The father] has maintained a persistent pattern of conduct that has served to diminish the children's relationship with their mother."); *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215 (Iowa Ct. App. 1994) ("We recognize there are situations where one parent will seek to put the other parent in an unfavorable light. Some cases are slight and to be expected in our less than perfect society. Some cases are serious and should not be tolerated."); *In re Marriage of Downing*, 432 N.W.2d 692, 694 (Iowa Ct. App. 1988) (finding "the custodial parent's lack of cooperation with the noncustodial parent's efforts to maintain satisfactory visitation and communication with the children evidenced a substantial change in circumstances warranting a modification of the dissolution decree").

There are several categories of interference that shed light on our conclusion. Sommer undermined Jeffrey's custodial rights by making significant decisions regarding the child's welfare without consultation. *See In re Marriage of Stanley*, No. 16-1822, 2017 WL 1278364, at *2–3 (Iowa Ct. App. Apr. 5, 2017) (affirming modification where mother failed to consult with father on matters involving the children, including education and therapy). Sommer did not consult with or tell Jeffrey of changes she made with respect to the child's doctor, dentist, and therapist. Sommer frequently removed N.J. from school without Jeffrey's knowledge or over Jeffrey's objection for trips with her family despite the school expressing concerns regarding N.J.'s attendance. Perhaps most egregiously, Sommer did not tell Jeffrey about her plans to move with N.J. to Virginia until twelve days prior to the move. *See Carmichael v. Philpott*, No. 17-0124, 2018 WL

739275, at *3 (Iowa Ct. App. Feb. 7, 2018) ("Stacy's decision not to tell Clinton that she and the child—along with the rest of her family—were moving residences is not supportive of the child and Clinton's relationship."). By the time Sommer told Jeffrey of the move, she had secured housing, toured the available schools, and selected a school for N.J. Sommer testified she did not tell Jeffrey about the move because Jeffrey had no right to know any information regarding N.J.'s impending move to Virginia. When Jeffrey contacted the school in Virginia to obtain more information, the administration told him they were not allowed to provide the information. The district court inferred, and we agree, Sommer had instructed the new school to not provide information to Jeffrey.

Sommer falsely accused Jeffrey of illegal conduct. *See Rosenfeld*, 524 N.W.2d at 215–16 (noting false allegations of abuse as relevant in establishing a change in circumstances); *In re Marriage of Winnike*, 497 N.W.2d 170, 174 (Iowa Ct. App. 1992) (discussing significance of false sex abuse allegations made by mother). Sommer repeatedly told school officials Jeffrey had attempted to kidnap N.J. There was no basis for the allegations. Sommer unilaterally demanded all exchanges occur at the police station even though the decree did not provide for this. Sommer told Jeffrey the police told her to make this change for her safety despite no credible evidence of any safety risk. Sommer ultimately conceded she demanded this change without police consultation. On the last day of the modification trial, Sommer accused Jeffrey of child abuse. This was the first time allegations of child abuse had been raised in this proceeding even though Sommer had provided testimony on four prior occasions. When asked why she had not reported the alleged incidents before, she said she had never been asked. This

claim directly contradicts earlier statements she made that Jeffrey "never hurt" the child.

Sommer actively interfered with Jeffery's visitation with N.J. or attempted to make any visitation with the child more difficult. For example, Sommer attempted to restrict Jeffrey's three weeks of summer visitation because Jeffrey did not have three weeks of vacation time and, in her view, Jeffrey should not be allowed visitation with the child when Jeffrey had to work. She ignored the fact Jeffrey could have made other care arrangements and the fact Jeffrey wanted to encourage a relationship between N.J. and Jeffrey's fiancé. This was a repeated pattern with respect to visitation generally. For example, on one occasion Sommer sent Jeffrey a text message asking whether he was working one of the days during Jeffrey's visitation. He responded he was, but his fiancé was with the child. Sommer responded, "Unfortunately Jeff I'm the primary care taker so if your [sic] working N.J. is to be with me. Therefore I'll be picking up N.J. on Saturday night." In 2015, Sommer denied Jeffrey visitation over the Thanksgiving holiday, forcing Jeffrey to cancel travel plans to see his family and plane tickets. Sommer tried to block Jeffrey from taking N.J. to the Hoover Dam on vacation, stating it was not "age appropriate." Sommer attempted to block Jeffrey from picking the child up from school without her being present. She submitted to the school an altered version of the decree with a handwritten notation stating, "Dad cannot take [N.J.] from school without Mom." On at least one occasion, Jeffrey had to call police to receive his visitation as scheduled because Sommer refused it. Sommer denied Jeffrey all day visitation with N.J. over the summer months when N.J. was not in

school.  Finally, Sommer denied nearly every attempt made by Jeffrey to spend extra time with N.J.  Jeffrey documented at least sixty such incidents.

When Sommer allowed visitation, she exhibited an intense distrust of Jeffrey manifested in an overzealous and overbearing supervision of Jeffrey's visitation with the child.  *See In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 478 (Iowa 1993) (discussing mother's distrust and "possessiveness" over child as significant issues warranting modification and change in custody).  She forced Jeffrey to submit his full work schedule to her to satisfy her demand Jeffrey be able to spend every minute of his visitation with N.J.  If Jeffrey refused to do this, she denied his visitation.  She required Jeffrey to provide her with the details of any visitation in advance of the visitation, including information regarding where Jeffrey intended to take the child, the identity and contact information for any persons who might interact with the child, and a detailed itinerary of activities.  She sent Jeffrey a text message stating, "Also I have to know where N.J. is.  It's my right as a parent.  And you keeping that info from me is a class D felony."  She photographed Jeffrey during exchanges of the child.  She also gave N.J. a GPS-enabled watch that allowed her to monitor N.J.'s location during Jeffrey's visitation.

Finally, Sommer directly undermined Jeffrey's relationship with N.J. and vice versa by speaking poorly of Jeffrey.  *See Carmichael*, 2018 WL 739275, at *3 ("[W]e believe her attempts to drive a wedge between the child and Clinton constitute a substantial change in circumstances."); *Berriault v. Alden*, No. 16-0763, 2017 WL 702371, at *3 (Iowa Ct. App. Feb. 22, 2017) ("June's concerted efforts to sabotage J.D.B.'s bond with his father rise to the level of a substantial change in circumstances that was not contemplated at the time the court entered

the decree and that relates to J.D.B.'s welfare."); *In re Marriage of Walters*, No. 11-1746, 2012 WL 2411183, at *3 (Iowa Ct. App. June 27, 2012) ("One parent's actions which undermine the child[]'s relationship with the other parent can be the triggering event for modification."); *In re Marriage of Wedemeyer*, 475 N.W.2d 657, 659 (Iowa Ct. App. 1991) (modifying custody based on destructive allegations made to the children by the mother about the father). Sommer told N.J. his stepfather, Sommer's husband, was N.J.'s real dad and Jeffrey was just "playmate dad." Sommer told N.J. Jeffrey never wanted him. She told N.J. Jeffrey is a liar. She told N.J. that Jeffrey drained the family's bank accounts. Sommer told N.J. on speakerphone that he was brave to stay at his father's house, intimating to the child there was something wrong with staying at the father's house. When N.J. would send inappropriate text messages to the mother, for example stating he loved Sommer "so much better than Daddy" or sending a picture of Jeffrey's fiancée with the following negative emoji 🫠💀, Sommer never redirected the child or encouraged the child's relationship with the father or the father's fiancé.

When the district court reconciled the competing testimony and evidence, it found Sommer not credible. The district court found some of her testimony "preposterous and insulting to the court's intelligence." Overall, the district court found, "Jeffrey was credible. Sommer was not." We agree. Crediting Jeffrey's testimony, the evidence shows a material and substantial change in circumstances. There has been a breakdown in communication between the parties caused by Sommer's possessiveness of the child and misguided mistrust of Jeffrey. Sommer has demonstrated she will not support Jeffrey's role as N.J.'s parent. Quite the opposite, Sommer has demonstrated she will actively undermine

Jeffrey's role as N.J.'s parent. *See In re Marriage of Kunkel*, 555 N.W.2d 250, 254 (Iowa Ct. App. 1996) (awarding physical care to "the parent with less primary care experience" because mother's "contentious disposition and hostile temperament [are] incompatible with the considerable rights and responsibilities attending an award of physical care.")

The evidence also shows Jeffrey would be able to minister more effectively to the needs of the child and a change in physical care is in the child's best interest. The legislature has defined the "best interest of the child" as including, but not limited to, "the opportunity for maximum continuous physical and emotional contact possible with both parents, unless direct physical or significant emotional harm to the child may result from this contact." Iowa Code § 598.1(1) (2017). Thus, "[a] parent's willingness to encourage contact with the noncustodial parent is a critical factor in determining custody." *In re Marriage of Gartner*, No. 15-1370, 2016 WL 3002778, at *6; *see also Bailey v. Rinard*, No. 17-1055, 2017 WL 6026469, at *3 (Iowa Ct. App. Nov. 22, 2017); *In re Marriage of Shanklin*, 484 N.W.2d 618, 619 (Iowa Ct. App. 1992). It is in the best interest of the child to have positive relationships with his mother and his father. That will not happen if Sommer has physical care of the child. This is particularly true if Sommer were to maintain physical care of the child in Virginia where the physical distance between the child and his father would only amplify Sommer's attempts to create emotional distance between the child and his father. In contrast, despite her outrageous conduct, Jeffrey has been courteous to Sommer. He testified about the importance of maintaining a relationship between Sommer and N.J. We credit Jeffrey's testimony about his willingness to facilitate a relationship between N.J. and

Sommer.  It is more likely the child will have a healthy relationship with both of his parents if Jeffrey is granted physical care of the child.

We recognize Sommer and her husband recently have had a child and N.J. thus has an infant half-sibling.  Generally, siblings should not be separated, including half-siblings.  *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986).  However, simply because one parent has physical care of a half-sibling does not mean the parent must have physical care of the child at issue.  *See In re Marriage of Brauer*, 511 N.W.2d 645, 647 (Iowa Ct. App. 1993).  While it is important to keep siblings together, ultimately the child's long-term best interests are the primary concern of this court.  *Id.*  Sommer's destructive behavior is harmful to N.J.  Placing N.J. with his infant half-sister is not so important as to overcome the lasting harm to N.J., his development, and his relationships.

For these reasons, we affirm the district court's modification of the parties' decree awarding physical care of N.J. to Jeffrey with Sommer to have liberal visitation.

II.

Sommer challenges the district court's rulings on Jeffrey's applications to hold Sommer in contempt.  The district court found Sommer in contempt on five counts, only four of which are challenged on appeal.  The contempt citations at issue in this appeal are as follows:    (1) Sommer denied Jeffrey court-ordered visitation on repeated occasions; (2) Sommer required Jeffrey to pick up and drop off N.J. at the police station contrary to the dissolution decree; (3) Sommer refused to allow Jeffrey to pick up N.J. until 6:00 p.m. on November 23, 2016, contrary to

the order of the court; and (4) Sommer improperly took the tax exemption for N.J. for the 2015 tax year.

A contempt proceeding is quasi-criminal in nature, and each element must be proved beyond a reasonable doubt. *See In re Marriage of Ruden*, 509 N.W.2d 494, 496 (Iowa Ct. App. 1993). "A party alleging contempt has the burden to prove the contemnor had a duty to obey a court order and willfully failed to perform that duty." *Ary v. Iowa Dist. Ct.*, 735 N.W.2d 621, 624 (Iowa 2007). "If the party alleging contempt can show a violation of a court order, the burden shifts to the alleged contemnor to produce evidence suggesting the violation was not willful." *Id.* There are at least two ways a contemnor may show that a failure to comply was not willful: (1) by showing that the order was indefinite on the issue; or (2) by showing that the contemnor was unable to perform the act ordered. *See Christensen v. Iowa Dist. Ct.*, 578 N.W.2d 675, 678 (Iowa 1998). "However, the person alleging contempt retains the burden of proof to establish willfulness beyond a reasonable doubt because of the quasi-criminal nature of the proceeding." *Ary*, 735 N.W.2d at 624. "[A] finding of disobedience pursued 'willfully' requires evidence of conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemnor had the right or not." *Id.* "Because a finding of contempt must be established by proof beyond a reasonable doubt, substantial evidence sufficient to support a finding of contempt is evidence that could convince a rational trier of fact that the alleged contemner is guilty of contempt beyond a reasonable doubt." *Id.* at 624–25.

A.

Sommer argues the evidence does not support a finding of contempt based on the denial of visitation. We disagree. The evidence, including testimony, text messages, and emails, establishes Sommer denied Jeffrey visitation during the 2015 Thanksgiving holiday, denied all-day summer visitation authorized in the decree, and denied Jeffrey New Year's day visitation with the child. There evidence supports the finding that Sommer's denial of visitation was in knowing and willful violation of the decree.

B.

Sommer contends she not did engage in contumacious behavior by requiring exchanges to occur at the police station. We agree. Willful disobedience requires evidence of conduct which is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether had the right or not. *Bell v. Iowa Dist. Ct.*, 494 N.W.2d 729, 730 (Iowa Ct. App. 1992). As noted above, when requesting the change in the exchange location, Sommer falsely told Jeffrey the police told her all exchanges should take place at the police station. While this was unnecessary and showed Sommer's irrational mistrust of Jeffrey, it was not in direct violation of the parties' decree. The decree provides the party who is to receive the child shall provide transportation, but the decree does not specify where the exchanges should take place. In addition, although Jeffrey thought the exchanges at the police station were unnecessary and contrary to the decree, he reluctantly agreed to Sommer's demand. There is not substantial evidence supporting the claim that Sommer willfully violated a known duty.

C.

There is not substantial evidence supporting the district court's finding of contempt with respect to the denial of Thanksgiving visitation. The contumacious act specified in the show cause application related to Sommer delaying the pickup time from 5 p.m. until 6 p.m. The application was filed prior to the scheduled exchange time after Sommer threatened to delay the exchange. It is undisputed that the attorneys intervened and visitation actually commenced at the proper time.

D.

Finally, the district court found Sommer in contempt for wrongfully claiming the 2015 tax exemption for the child. The dissolution decree provided Jeffrey "shall be awarded the tax exemption each year so long as he is current in his support obligations." The decree also provided, however, Sommer would be entitled to the exemption should she "earn more than $22,000 in any tax year." In 2015, Sommer received distributions from her individual retirement account in excess of $22,000, and she claimed the exemption. The district court, relying on the definition of earned income, concluded Sommer wrongfully claimed this exemption. While we agree that Sommer was not entitled to claim the exemption, we do not find this non-compliance to be willful within the meaning of our case law. *See id.* at 730. Sommer testified she believed she was entitled to claim the exemption because she had reportable income over the threshold amount rather than just earned income.

Although this finding of contempt was not supported by substantial evidence, we see no reason to disturb the district court's judgment. As punishment for this violation, the district court required Sommer to file an amended 2015 tax

return. While Sommer's action in claiming the exemption did not rise to the level of willful disobedience of a court order, it was nonetheless contrary to the terms of the dissolution decree. The district court had the jurisdiction and authority to enforce its dissolution decree. *See In re Marriage of Cerwick*, No. 02-0606, 2003 WL 1043505, at *3 (Iowa Ct. App. Mar. 12, 2003*); see also In re Marriage of Lenger*, 336 N.W.2d 191, 191 (Iowa 1983) ("Iowa statutes provide for contempt proceedings as a means of enforcing the provisions of dissolution of marriage decrees."). "[A] court sitting in equity necessarily has considerable flexibility in framing a remedy." *Iowa Dep't. of Soc. Servs. v. Blair*, 294 N.W.2d 567, 570 (Iowa 1980). Requiring Sommer to amend her 2015 tax return is a proper equitable remedy even in the absence of a finding of contempt.

E.

Given that we have concluded three of the four contempt citations challenged on appeal are not supported by substantial evidence, we must address the question of whether the punishment for the remaining finding of contempt should remain unchanged or whether additional remedial action is necessary.

"A contemner's sentence is reviewed for an abuse of discretion." *Ary*, 735 N.W.2d at 624. The Code provides, "If a person against whom a temporary order or final decree has been entered willfully disobeys the order or decree, the person may be cited and punished by the court for contempt and be committed to the county jail for a period of time not to exceed thirty days for each offense." Iowa Code § 598.23(1). "[A]s an alternative to punishment for contempt," the court may provide alternative punishments related to the terms of the decree. Iowa Code 598.23(2). For example, the district court may modify visitation to "compensate for

lost visitation time" or "transfer[] custody" of the child. Iowa Code § 598.23(2)(b). In addition, section 598.24 allows for the imposition of attorney fees and costs as punishment for contempt where the contempt relates to a violation of the decree.

In the ruling on the modification petition and contempt applications, the district court awarded Jeffrey attorney fees in the amount of $10,000 "[b]ased on the success of Jeffrey's application to modify" and the success "on the majority of his contempt allegations." As is apparent from the language, the district court's punishments for the contempt citations were linked together and then further intertwined with the award of attorney fees based on Jeffrey's success on the merits of his petition. Because we have concluded three of the contempt citations were not supported by substantial evidence, and because there is no basis for determining what portion of the attorney fee award related to Jeffrey's success on the merits and what portion of the attorney fee award was deemed punishment for any particular contempt citation, we cannot apportion and reduce the attorney fee award in any principled way. We thus conclude it is necessary for the district court to determine whether the attorney fee award is still appropriate under the circumstances and the amount of any such award. We vacate the portion of the decree awarding attorney fees and remand this matter for reconsideration of the issue. *See, e.g., Moore v. Iowa District Ct.*, No. 15-1563, 2016 WL 5930763, at *3 (Iowa Ct. App. Oct. 12, 2016) (concluding two findings of contempt were not supported by substantial evidence and remanding for further consideration of the punishment for the findings of contempt supported by substantial evidence); *Smith v. Iowa Dist. Ct.*, No. 14-1040, 2015 WL 3624330, at *4 (Iowa Ct. App. June 10, 2015) (remanding for determination of proper punishment for contempt); *In re*

*Marriage of Bayers*, No. 13-1136, 2014 WL 4635460, at *4 (Iowa Ct. App. Sept. 17, 2014) (remanding for imposition of contempt sentence).

## III.

Jeffrey raises several challenges to the visitation granted to Sommer. Sommer argues the issue was not properly preserved because Jeffrey failed to cross-appeal. We agree, and we decline to address these challenges further. *See Midwest Hatchery & Poultry Farms, Inc. v. Doorenbos Poultry, Inc.*, 783 N.W.2d 56, 64 n.7 (Iowa 2010) (finding where party does not appeal or cross-appeal "it is entitled to no greater relief than it was accorded in the district court."); *In re Marriage of Pieper*, 369 N.W.2d 439, 442 (Iowa 1985) (declining relief where "Loris asks affirmative relief by us by way of a further increase in the amount of the educational child support decreed by the trial court, but she did not cross appeal.").

## IV.

Both parties request appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. In determining whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). After considering these factors, we find neither party is entitled to an award of attorney fees. Both families have substantial incomes, and both achieved success in this appeal.

## V.

We affirm the district court's modification of the decree. We vacate the contempt citations as set forth above. We vacate the district court's award of

attorney's fees, and we remand this matter for a redetermination of the attorney fee award.

**MODIFICATION AFFIRMED. CONTEMPT CITATIONS AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**