**IN THE COURT OF APPEALS OF IOWA**

No. 23-1484
Filed January 23, 2025

**IN RE THE MARRIAGE OF ABBEY M. FAUST
AND DOUG J. FAUST**

**Upon the Petition of
ABBEY M. FAUST,**
        Petitioner-Appellee,

**And Concerning
DOUG J. FAUST,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Jones County, David Cox, Judge.


        A former spouse appeals the spousal-support award of a decree dissolving

the parties' marriage. **AFFIRMED.**


        Alexander S. Momany of Howes Law Firm, P.C., Cedar Rapids, for

appellant.

        Lea M. Kieffer of Iowa Legal Aid, Dubuque, for appellee.


        Considered by Schumacher, P.J., and Ahlers and Langholz, JJ.

**LANGHOLZ, Judge.**

In the decree dissolving their fifteen-year marriage, Doug Faust is ordered to pay Abbey Faust monthly spousal support for ten years. For about the first year, while Doug also has a child-support obligation, the monthly amount is $1915, and then the amount increases to $2800. Doug appeals, arguing that the award is inequitable and should be denied or substantially reduced in duration or amount. He contends mainly that Abbey failed to prove that she was unable to work because of a disability and thus cannot show an award of traditional spousal support is appropriate since their marriage was shorter than the typical twenty-year durational threshold for that support.

On our de novo review, mindful of the superior position of the district court to assess Abbey's credibility about her disability and the supreme court's admonition to refrain from undue tinkering with spousal-support awards on appeal, we agree with the district court that the award is equitable. We thus affirm.

I.

Doug and Abbey were married for about fifteen years. They are both in their mid-forties. And they have one daughter who was about to start her senior year of high school at the time of trial.[1]

At the start of their relationship, Abbey worked full-time outside the home. But the parties then decided that she would stay home to save on daycare expenses. After trying "that for a little bit" and realizing "it did not work," Abbey decided she "need[ed] to work at least half time." She first worked as a certified

---

[1] Abbey also testified about another adult daughter, but the record lacks any relevant details about this other daughter.

nursing assistant but injured her wrist while working and could no longer perform required duties, like "lift[ing] a full-sized person."

Abbey then worked as a special education para-educator for about six years. In September 2019, she was injured at work by one of her students who "latched onto [her] arm and tore a couple of things in [her] shoulder after getting scared." She tried to continue at that job after the injury, working "off and on" as much as her arm could handle it. She last worked at the school in May 2022, after which she was let go "because they said that [her] shoulder was not safe to work with children in the job." By the end of her employment, she was making about $14 per hour—or roughly $11,000 per year given her part-time, school-year hours.

Abbey has not returned to work since then. But she hopes to return to work eventually and planned to get an evaluation about what work she can perform with her injured shoulder. To make ends meet, Abbey has used credit cards, some of her workers' compensation settlement from her shoulder injury, and sold some of her jewelry and five of the family's eight horses.

Doug works for an agricultural and energy cooperative. He is paid on commission, so his income varies. In 2022, he earned $115,449. Based on his earning in the first half of 2023, he was on track to make $142,950 in that year. And at the time of trial, his take-home pay after taxes was about $6000 per month.

In August 2023, after a half-day trial—during which Abbey represented herself—the district court dissolved the parties' marriage. As relevant here, the court ordered Doug to pay Abbey traditional spousal support for up to ten years starting on September 1—$1915 per month until his child-support obligation ends

and then $2800 per month.[2]  The court also equitably divided the marital property. That division did not award Abbey many immediately liquid assets—though on the sale of the marital home, she would receive an equal portion of any net proceeds.

Doug now appeals, challenging only the spousal-support award.  Abbey initially cross-appealed but later voluntarily dismissed her cross-appeal.

## II.

We review a district court's spousal-support award de novo.  *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023).  But we defer to the court's "important, but often conjectural, judgment calls" and must not engage in "undue tinkering" with the award on appeal.  *Id.* at 182–83 (cleaned up).  And so, we will "disturb the district court's determination of spousal support only when there has been a failure to do equity."  *Id.* at 182 (cleaned up).

"Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case."  *In re Marriage of Mills*, 983 N.W.2d 61, 67 (Iowa 2022).  And to decide what award—if any—is equitable, we must consider the statutory factors under Iowa Code section 598.21A(1) (2022).  *See id.*

The district court awarded Abbey only one of the four forms of spousal support recognized by our supreme court: traditional spousal support.  Such support "is equitable in marriages of long duration to allow the recipient spouse to

---

[2] Doug's child-support obligation was ordered to continue until their daughter turns eighteen, dies, or marries unless she is still in high school after turning eighteen and expects to graduate before turning nineteen, in which case it would continue until she graduates.  Assuming she completed her senior year of high school as expected, the support would thus continue for about a year until she turned eighteen in June 2024.

maintain the lifestyle to which he or she became accustomed. Generally, only marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support." *Sokol*, 985 N.W.2d at 185 (cleaned up). But a "spouse's disability suffered during the parties' marriage" may justify an award of traditional spousal support even in shorter marriages if the disability "substantially reduce[s] a spouse's earning capacity and feasibility of self-support." *Mills*, 983 N.W.2d at 71. Our supreme court has thus affirmed an award of traditional spousal support until the death or remarriage of either party in a fourteen-year marriage based mainly on the recipient's "permanent disability and lack of earning capacity" that was caused by the birth of the parties' only child. *Id.* at 71–72.

Doug mainly argues that Abbey failed to show that she suffered a disability that substantially reduces her earning capacity and feasibility of self-support enough to justify an award of traditional spousal support after only fifteen years of marriage. But on our de novo review of the evidence, we agree with the district court's finding that Abbey "has a substantial injury to her shoulder that prevents her from working at a level similar that which she enjoyed during the marriage." This finding is supported by ample testimony by Abbey—which the district court credited from its "front-row seat" to both the testimony and parties throughout the trial. *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024). And we give weight to this assessment since "our review is limited to reading black words on a white page of a sterile transcript."

Abbey testified that she injured her shoulder while working as a para-educator and that, after trying to continue to work, she lost her job when the school

decided she could no longer safely perform her duties. She detailed her two surgeries on the shoulder—with a third still to come after the second surgery showed the should "has arthritis starting in it." And she described her current limitations—"every time [she] work[s], [her] arm swells" and "goes numb." Even at home, she "can't do repetitive motion right now because that causes swelling," she "drop[s] a lot of things" and sometimes has to "wait a day or two to do dishes." Further supporting that she suffered a workplace injury, she has already received a partial workers' compensation settlement of about $21,000.

True, as Doug critiques, Abbey did not present expert opinion or documentary evidence backing up her testimony—medical records, the workers' compensation settlement agreement, and the like. But Abbey's credible testimony alone is enough for us to agree with the district court's finding, particularly given the level of detail she shared. And this is not a case where her claimed disability rests entirely on her self-assessment—she pointed to the decision of her employer, the surgeries, and her workers' compensation settlements, which could have been independently verified if Doug believed the testimony was false. But while Doug contested Abbey's ultimate assertion she could not work, he did not present any contrary evidence on these underlying facts. Rather, he relied on Abbey's receipt of the settlement and the manner of her spending it as evidence that weighed in his favor and he agreed to pay her medical debt from some of her treatment.[3]

---

[3] In noting the testimony that Doug left uncontested, we are not—nor do we read the district court's decree to be—placing the burden of proof on Doug. But we consider that in deciding whether to believe Abbey's testimony and whether she has met her burden to show the spousal-support award is equitable.

Doug also argues that Abbey's initial return to work after the injury, her continued caring for three family horses, and a multi-week trip to Florida with their daughter weigh against her claim that she is unable to work. Yet Abbey's attempt to return to work weighs in favor—not against—her claim, suggesting that she would be working if she could. After all, it was her employer that decided it was unsafe for her to continue. And the record lacks evidence as to the physical demands on Abbey to continue the horse's care or to travel to Florida, and we do not find it self-evident that a person with a disabling shoulder injury could not engage in either activity. So we do not find those points particularly persuasive.

Beyond Abbey's disability, the other factors also support some award of traditional spousal support. Doug earns significantly more than Abbey—even when she was working part-time during the marriage she made roughly one-tenth of his earnings. *See in re Marriage of Geil*, 509 N.W.2d 738, 742 (Iowa 1993) (noting appellate courts have affirmed traditional spousal support awards "especially where the disparity in earning capacity has been great"). And it is difficult to see how she could maintain anything near their marital lifestyle without spousal support. Doug also has the ability to pay. His salary is substantial. And he candidly made a modest assessment of his own financial needs at about $2900—less than half of his roughly $6000 in monthly take-home pay.

Still, Doug argues that if we do not deny the spousal-support award entirely, then it should be reduced from its $2800 amount or its ten-year duration. But again, we agree that the district court's award is equitable. When deciding an equitable amount of traditional spousal support, the court must consider the earning capacity of each spouse, their current standards of living, and the spouse's

ability to pay weighed against the relative needs of the other spouse. *See In re Marriage of Hitchcock*, 309 N.W.2d 432, 436–37 (Iowa 1981).

Considering these factors, and refraining from undue tinkering, we do not quibble with the amount of the award. Where, as here, "there is a substantial disparity" in earning capacity, "we do not employ a mathematical formula to determine the amount of spousal support." *In re Marriage of Gust*, 858 N.W.2d 402, 411–12 (Iowa 2015). Abbey estimated her need as $3000. Doug estimated he has a little more than $3000 available from his take-home pay after accounting for his expenses. And the district court reduced Abbey's request slightly to $2800. Considering the property division as well, which gives few immediately liquid assets, we cannot say this amount is inequitable.

Nor do we see any reason to reduce the ten-year duration of the award. Traditional spousal support "is ordinarily of unlimited or indefinite duration." *Id.* at 408. The district court reasoned that it would not order the typical indefinite support "[w]ithout additional information" about her medical condition, her eventual ability to work, and any eligibility for disability payments. It matters not whether we agree with that logic for refraining from an indefinite award because Abbey does not cross-appeal. So we cannot grant her any more relief than what she was granted by the district court. *See Midwest Hatchery & Poultry Farms, Inc. v. Doorenbos Poultry, Inc.*, 783 N.W.2d 56, 64 n.7 (Iowa Ct. App. 2010). Given that the award is already an atypical reduced duration, equity does not require an even shorter duration for this traditional spousal-support award.

**AFFIRMED.**

Schumacher, P.J., concurs; Ahlers, J., dissents.

**AHLERS, Judge** (dissenting).

Even accepting the district court's determinations that Abbey Faust has no income and no income should be imputed to her—determinations of which I am skeptical on this record—the spousal support set by the district court is inequitably high. As a result, I cannot join the majority's decision to affirm.

A review of the parties' finances shows a fair amount of operating debt, suggesting the parties were in the fairly common situation of struggling to some degree to meet their living expenses when they had one household to maintain. Now that they have two households to maintain, there is not enough money for both parties to maintain their same standards of living. *See In re Marriage of Stenzel*, 908 N.W.2d 524, 534 (Iowa Ct. App. 2018) ("Often in marriage dissolutions, incomes that were adequate to support married couples and their children are stretched precariously thin in order to cover the expense of maintaining two separate households." (citation omitted)). While I agree that some amount of spousal support is warranted with the goal of helping Abbey achieve some semblance of the standard of living enjoyed during the marriage, it should not be done at the expense of Doug being able to maintain his. *See id.* ("[I]f the same standard of living cannot be maintained, support should not be fixed at the cost of the standard of living of the payor.").

The district court's spousal-support decision does not strike this balance and is inequitable. We should not dodge our obligation to correct the inequity by wrapping ourselves in the cloak of the directive not to unduly tinker with the district court's decision. *See In re Marriage of Sokol*, 985 N.W.2d 177, 182–83 (Iowa 2023) (directing that spousal-support awards should only be disturbed when they

fail to do equity, and appellate courts should avoid "undue tinkering" with them). Tinkering isn't warranted here. A wholesale change is. I would modify the district court's order to provide for ten years of spousal support at $1600 per month. As such, I respectfully dissent from the majority's decision to affirm.