640 F.2d 147
 30 UCC Rep.Serv. 839
 SELECT PORK, INC., Randall Dreeszen, Brian Bruning,
Geraldine Bruning and Brian Bruning, Co-executors of the
Estate of LaVerne Bruning, deceased, David Volkert, Dwight
Puttmann, Ross Reinking, Stanley Allen, Steve Allen, Dennis
Reinking and Eldon Hecht, Plaintiffs-Appellees and Cross-Appellants,
v.
BABCOCK SWINE, INCORPORATED, Babcock Industries, Inc.,
Defendants-Appellants and Cross-Appellees.
 Nos. 80-1355, 80-1364.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 15, 1981.
Decided Feb. 6, 1981.
 
 P. L. Nymann, Sioux City, Iowa, for appellant.
 Michael R. Mundt, Denison, Iowa, for appellee.
 Before HEANEY, Circuit Judge, GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.
 ARNOLD, Circuit Judge.
 
 
 1
 Select Pork, Inc., and ten individual plaintiffs brought suit against Babcock Swine, Inc., and Babcock Industries, Inc. for damages arising from the alleged breach of a contract for the sale of 575 pigs. Plaintiffs alleged breach of implied and express warranties, fraud, and conspiracy. After a non-jury trial, the court[1] awarded plaintiffs damages totalling $552,781.29 on their breach of warranties claims, but held in favor of defendants on the issue of fraud. Both sides now appeal. We affirm.
 
 
 2
 The facts are fully stated in the district court's unreported opinion. In brief, Babcock began selling boars and gilts as breeding stock in 1971. In 1973 Babcock began advertising for sale a feeder pig for breeding which it called the "Midwestern Gilt." As a part of its national advertising campaign, the company prepared a brochure entitled "Meet the Midwestern Gilt."
 
 
 3
 The court below found that this brochure contained certain material representations about the Midwestern Gilt. The gilts were described as bred of three pureline strains, Landrace, Hampshire, and Yorkshire. They were represented as being bred especially for confinement rearing systems at Babcock's research and development center at Rochester, Minnesota. The brochure further promised that offspring of these gilts would be ready for market in an average of five months. Prominently displayed was a computation of extra profit per gilt of $416.00. The Midwestern Gilt was described as "the gilt of the future" and "not just another pig."
 
 
 4
 Other representations made in the brochure and orally were that the gilts would be SPF-like[2] (as close to disease-free as possible); that the gilts would produce 825 pigs per month in a unit of 550 gilts; and that defendants were experts in genetics and hog confinement management.
 
 
 5
 Plaintiffs talked to Babcock sales representatives several times in 1973. The brochure "Meet the Midwestern Gilt" was given to plaintiffs at these sales meetings. In April of 1974 plaintiffs signed a contract for the purchase of 550 Midwestern Gilts and 25 Meatline Boars. The sales contract contained a general disclaimer of all warranties other than those specified in the contract, an integration clause, and a limitation-of-damages clause limiting any remedy for breach to the amount of the purchase price and excluding all consequential damages.
 
 
 6
 At the time of contracting, Babcock knew it did not have sufficient number of Midwestern Gilts to sell to plaintiffs or any other customers. At the time set for delivery, a sufficient number of Midwestern Gilts was still not available. Babcock substituted pigs bought from a commercial dirt lot in Kansas.
 
 
 7
 The hogs plaintiffs received were subsequently found to be diseased with atrophic rhinitis, mycoplasma pneumonia, and swine dysentery and infected with lice and mange.[3] Instead of receiving three-way-cross gilts and two-way-cross boars bred to thrive in confinement, plaintiff received a two-way-cross gilt and a purebred boar. The court further found that plaintiffs did not receive animals which would be ready for market on the average of five months of age or animals which would bring an extra return of $416.00 per gilt over and above a normal profit.
 
 
 8
 Plaintiffs began experiencing trouble with the pigs within a few months after delivery. Consultation with veterinarians and medicine were required to treat the various diseases. Production was lower than promised or expected. After discovering that the pigs were not Midwestern Gilts and Meatline Boars, plaintiffs filed suit.
 
 
 9
 Defendants' major argument for reversal is that the district court erred in its interpretation and application of Iowa's Uniform Commercial Code. Iowa Code Ann. § 554.1101 et seq. Babcock argues that there is no basis on these facts for nullifying the disclaimers of warranty and limitation of remedies in the written contract. We cannot agree. While the contract appeared to disclaim all warranties other than those contained in the contract itself, the contract by its own terms was an agreement for the sale of two specific breeds of pigs, Midwestern Gilts and Meatline Boars. This warranty of descripton appears in the contract and usually cannot be disclaimed. See Iowa Code Ann. § 554.2313, U.C.C. Comment 4; White & Summers, Handbook of the Law Under the Uniform Commercial Code § 12-3, at 353 (1972). We accept the district court's holding that under Iowa law the specific representations made in the brochure "Meet the Midwestern Gilt" became part of the warranty of description found in the contract, at least to the extent that they defined what a Midwestern Gilt is. See Vorthman v. Keith E. Myers Enterprises, 296 N.W.2d 772, 774-76 (Iowa 1980) (oral statement that pigs were "good healthy feeder pigs" created express warranty which was not waived as a matter of law by acceptance of pigs "as is"); Midland Forge, Inc. v. Letts Indus., Inc., 395 F.Supp. 506, 511 (N.D.Iowa 1975). There is ample evidence that plaintiffs relied upon these representations in agreeing to buy Midwestern Gilts and Meatline Boars. When defendants failed to deliver the promised breed of confinement-raised pigs, they were in breach of the warranty of description contained in the contract, disclaimer clauses notwithstanding.
 
 
 10
 The district court held that the limitation-of-remedies clause failed of its essential purpose because defendants did not deliver Midwestern Gilts and Meatline Boars as described in the contract. The court further held that the limitation on recovery of consequential damages was unconscionable because defendants knew at the time of the making of the contract that they were just entering the swine production field and that there was a chance they would not be able to produce enough pigs to meet contract requirements. Two provisions of the Uniform Commercial Code support this result. Iowa Code Ann. § 554.2719(2) provides that
 
 
 11
 Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.
 
 
 12
 And Iowa Code Ann. § 554.2719(3) provides that limitations on consequential damages are void if the court finds them "unconscionable." Although the district court's opinion is not fully developed on this point, we find no error in its conclusion. Had Babcock delivered the promised Midwestern Gilts and Meatline Boars, then the clause limiting damages to return of the purchase price would have been reasonable. As events developed, however, the very special pigs promised by Babcock were never delivered. Babcock knew the pigs were not the type promised; plaintiffs did not. The failure to deliver Midwestern Gilts is the heart of this case.[4] Under the circumstances, fairness[5] and the Uniform Commercial Code do not require that plaintiffs be held to a remedial limitation which they thought would be applicable to the Midwestern Gilts which they agreed to buy. Having failed to deliver the highly-touted special pigs, defendants may not now assert a favorable clause to limit their liability.
 
 
 13
 We have thoroughly considered the parties' contentions on the issues of damages and find no error in the district court's conclusions. The findings of fact are fully supported by the record. We deem it unnecessary to discuss the fraud claim. The judgment on the breach-of-warranties claim fully compensates plaintiffs for their loss.
 
 
 14
 Affirmed.
 
 
 
 [1]
 The Honorable Donald E. O'Brien, United States District Judge for the Northern and Southern Districts of Iowa
 
 
 [2]
 SPF means specific-pathogen free, that is, free of certain common hog diseases
 
 
 [3]
 At the time of delivery plaintiffs were given health certificates for the pigs signed by a licensed veterinarian. These certificates described the animals as "free from visible signs of infectious, contagious or communicable disease." The district court found, however, that the pigs were diseased at the time they were delivered to plaintiffs
 
 
 [4]
 Throughout the five-page brochure "Meet the Midwestern Gilt" the emphasis is on the uniqueness and quality of this particular gilt. "When your first load of gilts is delivered by Midwestern, you may think that this looks like another load of gilts, but take a closer look .... She may look like another pig but believe us, a Midwestern Gilt is a lot different."
 
 
 [5]
 "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." Iowa Code Ann. § 554.1203; " 'Good faith' means honesty in fact in the conduct or transaction concerned." § 554.1201(19)