**Lynn BRUNSMAN and Karen Brunsman, Plaintiffs,**

v.

**DeKALB SWINE BREEDERS, INC., Defendant.**

**No. C95–2054.**

United States District Court, N.D. Iowa, Eastern Division.

Dec. 8, 1996.

James E. Bennett, Peter C. Riley, Tom Riley Law Firm, Cedar Rapids, IA, for Plaintiffs Ronald Nelson, Brenda Nelson and Lynn Brunsman and Karen Brunsman.

Charles T. Patterson, Margaret M. Prahl, Eidsmoe Heidman Redmond & Fredregill, Sioux City, IA, for Defendant DeKalb Swine Breeders, Inc.

### OPINION and ORDER

MELLOY, Chief Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. # 8), filed June 17, 1996. Plaintiffs initially filed their complaint in state court, alleging: 1) breach of express warranties; 2) breach of implied contract; 3) breach of implied warranty of fitness for a particular use or purpose; 4) breach of implied warranty of merchantability; 5) negligent misrepresentation; 6) fraudulent misrepresentation; 7) negligence; and 8) breach of contract. The case was removed to this Court on June 26, 1995. Defendant now moves for summary judgment on all counts.

### BACKGROUND

Plaintiffs' claims arise out of their purchase of seven boars from Defendant pursuant to a contract dated October 29, 1992. The boars were delivered on April 12, 1993 and were bred to Plaintiffs' gilts. In August of 1993, some of the baby pigs born to the

gilts showed signs of shaking, a condition known as shaker pig syndrome or congenital tremors, a virus for which there is no manner of detection or cure. Plaintiff claims at least 100 baby pigs died as a result. When Plaintiffs questioned a representative of Defendant regarding the congenital tremors, they were informed that it would "run its course." Plaintiffs' veterinarian provided them with the same advice.

The contract between Plaintiffs and Defendant contained the following provision regarding the time limit for bringing suit:

*TIME TO BRING SUIT.* THE BUYER AGREES THAT IN NO EVENT MAY ANY LAWSUIT ARISING OUT OF THE SWINE SOLD HEREUNDER OR OF THIS CONTRACT BE FILED AGAINST DEKALB MORE THAN ONE YEAR FROM DELIVERY OF THE SWINE.

The contract also provided the following provisions:

### 4. *FERTILITY—LIMITED WARRANTY AND LIMITED REMEDY.*

#### A. LIMITED WARRANTY

Subject to paragraph 5C, DEKALB warrants that:

**Boars.** A boar will serve and settle sows after he has reached eight months of age, under hand mating conditions only (some boars may need assistance). This warranty is not made when boars are used for pen or pasture breeding. . . .

#### B. LIMITED REMEDY

**As BUYER'S sole and limited remedy,** for an animal which does not conform to this Limited Warranty of Fertility, DEKALB shall, at its option, either (i) deliver a replacement animal or (ii) refund its purchase price, subject to the following:

**Physical Condition.** At time of replacement the swine to be replaced must be of the same flesh and physical condition as it was at the time of purchase.

**No Maintenance Charges.** When replacement is made, no charges for feed or maintenance shall be made by DEKALB or BUYER.

**Procedures for Claim.** All claims for lack of fertility shall be made in writing to DEKALB within five calendar months af-

ter date of delivery. The BUYER shall at BUYER's expense, and at DEKALB's option (i) return the animal to DEKALB's place of business or (ii) send the animal to slaughter and provide for payment of all market proceeds directly to DEKALB.

### 6. *PATHOGENS AND DISEASE— STATEMENT AND LIMITED REPLACEMENT POLICY.*

**PATHOGENS AND DISEASE STATEMENT.**

**Organisms which cause swine diseases (called pathogens) are present in virtually every swine herd, including DEKALB's swine herds. Pathogens or diseases which have occurred, or which may occur, in DEKALB's swine herds include: ... Viral Pathogens: ...** congenital tremors virus . . .

The outbreak of diseases, however, is caused by many factors in addition to the presence of pathogens within a swine or a swine herd. Although DEKALB attempts to minimize the presence of pathogens and disease in its herds and in the swine breeding stock it sells, **DEKALB CANNOT AND DOES NOT GUARANTEE THE ABSENCE OF ANY PATHOGENS OR DISEASE IN THE BREEDING STOCK SOLD BY DEKALB. PATHOGENS OR DISEASES MAY BE PRESENT AT TIME OF SALE OR MAY APPEAR LATER.**

### 7. *TESTING AND QUARANTINE— BUYER'S RESPONSIBILITY.*

At BUYER'S expense, BUYER may have DEKALB test the swine for pathogens or diseases prior to delivery. BUYER may cancel this Contract prior to delivery on the basis of such test results. In such case DEKALB will refund the deposit, minus the costs of testing.

DEKALB suggests that BUYER quarantine all newly purchased stock after delivery and test for pathogens and diseases that are of concern to the BUYER.

BUYER expressly accepts all responsibility for:

a. The presence of any pathogen or disease (other than the Replaceable Diseases), including, but not limited to, those

pathogens or diseases listed in the Pathogen and Disease Statement above.

b. The emergence or appearance of a Replaceable Disease after the 10–day period or quarantine period, if applicable, set forth above has passed.

c. The presence of any pathogen or disease in any swine other than swine purchased under this Contract.

### 9. BUYER'S RESPONSIBILITY STATEMENT

There are numerous factors affecting the health, fitness, performance, and productivity of swine, including management, handling, nutrition, environment, sanitation, facilities, stress and disease. Furthermore, these same factors can cause and materially affect infertility and diseases of swine, and the resulting economic impact, if any.

**Except for the limited warranty and limited remedy set forth in paragraph 5 and the Replacement Policy set forth in paragraph 6, the BUYER accepts full responsibility for these other factors and for the health, fitness, performance and productivity of the swine sold hereunder or the Buyer's swine herd.**

**BUYER has full responsibility for swine mortality or lack of soundness unless caused by a Replaceable Disease.**

### 11. LIMITATION ON WARRANTIES AND REMEDIES

A. **WARRANTIES AND DISCLAIMERS OF WARRANTIES.** DEKALB WARRANTS ONLY THAT THE SWINE ARE AS DESCRIBED IN THIS CONTRACT, AND DEKALB ALSO PROVIDES THE LIMITED WARRANTIES REGARDING FERTILITY AS SET FORTH MORE FULLY IN PARAGRAPH 5. DEKALB GIVES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE SWINE OR THEIR PROGENY. DEKALB GIVES NO WARRANTIES OF MERCHANTABILITY, HEALTH OR FITNESS FOR A PARTICULAR PURPOSE.

B. **EXCLUSIVE REMEDIES.** BUYER'S REMEDY OF REPLACEMENT OF SWINE (OR AT DEKALB'S OPTION, REFUND OF THE PURCHASE PRICE) FOR FAILURE TO CONFORM TO THE WARRANTY OF CONTRACT DESCRIPTION, TO THE LIMITED WARRANTY OF FERTILITY AND FOR MANIFESTATIONS OF CERTAIN PATHOGENS OR DISEASES, AS MORE FULLY SET FORTH IN PARAGRAPHS 5 AND 6 ON THE BACK OF THIS PAGE, IS THE BUYER'S SOLE AND EXCLUSIVE REMEDY AS AGAINST DEKALB ARISING OUT OF THE PURCHASE OF SWINE HEREUNDER.

C. **TIME TO BRING SUIT.** THE BUYER AGREES THAT IN NO EVENT MAY ANY LAWSUIT ARISING OUT OF THE SWINE SOLD HEREUNDER OR OF THIS CONTRACT BE FILED AGAINST DEKALB MORE THAN ONE YEAR FROM DELIVERY OF THE SWINE.

D. **LIMITATION ON DAMAGES.** UNDER NO CIRCUMSTANCES SHALL DEKALB BE LIABLE TO BUYER FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OR CLAIMS OF ANY KIND, WHETHER ARISING IN CONTRACT, TORT, NEGLIGENCE, STRICT PRODUCTS LIABILITY, STATUTORY OR REGULATORY VIOLATION OR UNDER ANY OTHER LEGAL THEORY.

Paragraph six provides that Defendant will replace a boar or refund the purchase price upon a diagnosis of replaceable diseases (lice, mange, pseudorabies, swine dysentery, or atrophic rhinitis).

Lynn Brunsman wrote the word "none" in the blank prompted with the following language:

All of the promises, warranties, guarantees and representations made by the DEKALB sales person or any other representative of DEKALB that are not included in this Contract are as follow: (If none, please write "none." A blank will be considered "none.") ——

Lynn Brunsman signed the contract under the statement indicating that he had read the contract terms.

## ANALYSIS

### A. One–Year Limit

■ Defendant first argues that Plaintiffs cannot maintain this action because the contract specifically prohibits "any lawsuit arising out of the swine sold .. or of th[e] contract" more than one year after delivery of the swine. Plaintiffs maintain that a factual issue exists regarding whether the contractual limitation should be estopped. Both parties agree that the requirements for a successful estoppel claim are a showing by clear and convincing evidence that: a false representation or concealment of material facts by Defendant, lack of knowledge on the part of Plaintiff, intention by Defendants that the representation or concealment be acted on, and reliance by Plaintiffs to their prejudice. See *Hicks v. Franklin County Auditor*, 514 N.W.2d 431, 441 (Iowa 1994).

■ Plaintiffs argue that substantial evidence exists that they were assured the shaker pig syndrome suffered by their pigs was not related to Defendant's breeding stock. Plaintiffs conclude that their reliance on Defendant's representations creates a genuine issue of material fact regarding application of equitable estoppel. Defendant does not deny that its representative informed Plaintiffs that the shaker pig "would run its course." Whether this statement was a false representation intended to cause Plaintiffs to delay filing suit is a factual issue that cannot be resolved on summary judgment.

### B. Express Warranties

Defendant's first argument on the merits is that the terms of the contract bar the recovery sought by Plaintiffs because there is no evidence that the express warranties were breached. The only express warranties provided by the contract, Defendant maintains, is that the boars would be as described (paragraph 11) and that they would settle sows under hand mating conditions (paragraph 5). Plaintiffs contend, however, that the contract's warranty limitations are unconscionable, thus, the general warranties of merchantability and fitness for purpose apply.

Plaintiffs maintain that paragraph 11's warranty of description "provides nothing" because the description language is modified by paragraph 1(b) which states:

> Boar line or class substitutions may be made by DeKalb, and the above approximate delivery schedule is subject to availability and demands of other customers.

Plaintiffs also argue that paragraph 6, the disease replacement policy, provides no warranty as it is limited to five specific identified pathogens and contains conditions for making a claim.

The sole warranty provided by the contract, according to Plaintiffs, is the "fertility warranty" which insures only settling (conception), and does not guarantee that any offspring will be produced. The warranty is limited first by paragraph 5(B) which allows, at DeKalb's option, for replacement of the animal or refund of the purchase price, and also by paragraph 5(C) concerning "environmental factors that *might* affect the general health of the swine or cause disease to develop ..." which are present on every farm, according to paragraph 6. Plaintiff concludes that the contract is essentially an "as is" contract despite the "illusion of warranty" which appears on the contract's face. As such, the contract is unconscionable.

■ "A bargain is unconscionable if it is such as no person in his senses and not under delusion would make on the one hand, and as no honest and fair person would accept on the other." *Federal Land Bank of Omaha v. Reinhardt*, 428 N.W.2d 672, 673 (Iowa App.1988) citing *Smith v. Harrison*, 325 N.W.2d 92, 94 (Iowa 1982). When determining whether a contract is unconscionable, the court should examine the following factors: assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness. *Gentile v. Allied Energy Products, Inc.*, 479 N.W.2d 607, 609 (Iowa App.1991) (holding contract not unconscionable where parties were of equal bargaining power, plaintiff had opportunity to have an attorney review the contract, the contract was clear and easily read, the plaintiff had been a party to similar contracts in the past and was under no financial pressure to sign the con-

**634**

tract) citing *C & J Fertilizer v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 181 (Iowa 1975).

■ Plaintiffs argue that the terms of the contract with Defendant were not clear, as a reasonable person would not have accepted it if it had candidly stated it was an "as is" contract. Two district courts have found language identical to that contained in this contract to be clear and explicit. *Rayle Tech, Inc. d/b/a/ Callaway Farms, Inc. v. DeKalb Swine Breeders, Inc.*, 897 F.Supp. 1472 (S.D.Ga.1995); *Urschel Farms, Inc. v. DeKalb Swine Breeders, Inc.*, 858 F.Supp. 831 (N.D.Ind.1994). Both courts noted that the terms of the contract were presented in bold, underlined, and red print, as was the language in the contract signed by Plaintiffs.

Despite Plaintiffs' implication that Defendant was hiding the warranty limitations and the real meaning of the contract terms, the Court finds that the contract's language is clear and understandable. A harsh result or Plaintiffs' failure to read or fully understand the contract prior to signing it does not allow Plaintiffs to avoid the contract terms. Because Plaintiffs have not alleged that they were under pressure to sign the contract or that the contract was a result of unfair bargaining, the Court finds that the contract was not unconscionable.

■ Plaintiffs have not alleged that the boars provided by Defendant were not those described in the contract, nor have they claimed that the boars failed to settle Plaintiffs' gilts. Thus, when the boars supplied by Defendant settled Plaintiffs' gilts, Defendant had satisfied its contractual promise. Because Defendant did not breach the express warranties in the contract, it is entitled to summary judgment on the breach of contract and express warranty claims.

### C. Implied Warranties

■ Plaintiffs admit that, upon a finding that the contract is not unconscionable, Iowa Code sections 554.2314(1) and 554.2316 apply. They admit that the contract expressly limits the warranty of merchantability, mentions merchantability, and is conspicuous as required by section 554.2316(2). Plaintiffs make similar concessions regarding the implied warranty of fitness for a particular purposes provided in Iowa Code section 554.2315. Thus, the Court finds that the contract's disclaimers of the warranty of merchantability and the implied warranty of fitness for a particular purpose are valid and Defendant is entitled to summary judgment as to Plaintiffs' warranty claims.

### D. Limitation of Remedies

■ Defendant argues that Plaintiffs are seeking remedies that are not available to them by the terms of the contract. Paragraph 11 limits Plaintiffs' remedy to replacement of the swine or, at Defendant's option, refund of the purchase price. Such a limit cannot be enforced if the remedy fails of its essential purpose or if it is an unconscionable limitation on consequential damages. Iowa Code §§ 554.2719(2) and 554.2719(3).

■ Plaintiffs maintain that the limitation causes the remedy to fail its essential purpose because the replacement or refund of purchase price of the boars which spread the disease bears no relation to the damage which might be sustained. Plaintiffs' argument fails to address the relevant question, however. "The purpose of a remedy is to give the buyer what the seller promised him...." *Hartzell v. Justus Co., Inc.*, 693 F.2d 770, 774 (8th Cir.1982) (holding where a house sold by defendant was found to fall short of the seller's promises, and where it could not be repaired to the promised condition, defendant's liability could not be limited to the cost of repairs, however, "if the repairs had been adequate to restore the house to its promised condition, and if [plaintiff] had claimed additional consequential damages, for example, water damage to a rug from the leaky roof, the limitation-of-remedies clause would have been effective"), see also *Select Pork, Inc. v. Babcock Swine, Inc.*, 640 F.2d 147, 149–50 (8th Cir.1981) (where defendant promised to provide plaintiff with a certain type of high quality pig and defendant delivered ordinary pigs instead, court held "had [defendant] delivered the promised [pigs], then the clause limiting damages to return of the purchase price would have been reasonable ... The failure to deliver [the high

quality pigs] is the heart of this case ... Having failed to deliver the highly-touted special pigs, defendants may not now assert a favorable clause to limit their liability."). Thus, the focus of this analysis is not whether the remedy compensates for all damage that occurred, but that the buyer is provided with the product as seller promised.

Here Defendant promised to provide boars that conformed to the contract description and that would settle Plaintiffs' gilts. Because Plaintiffs did receive the boars as promised in the contract, there was no failure of remedy in this case and the limitation of remedy should be enforced.

### E. Negligent Misrepresentation

Even if Plaintiff's negligence actions were not barred by the contract's limitation of remedies, Defendant would be entitled to summary judgment on Plaintiffs' negligent misrepresentation claim. Plaintiffs concede that *Meier v. Alfa–Laval, Inc.*, 454 N.W.2d 576 (Iowa 1990) applies in this case. The *Meier* court held that liability based on the tort of negligent misrepresentation was limited to those persons in the business of supplying information versus persons who give information incidental to selling goods. *Id.* at 581. Clearly Defendant is more accurately described as in the business of selling goods, than as in the business of supplying information. In addition, even if Defendant were in the business of providing information, Plaintiffs' claim would fail in that Defendant did not supply "false information for the guidance of others in their business transactions." Restatement (Second) of Torts § 552(1). Thus, summary judgment is appropriate as to Plaintiffs' negligent misrepresentation claim.

### F. Fraudulent Misrepresentation

A successful fraudulent misrepresentation claim requires plaintiff to show that defendant made a representation, the representation was false, the representation was material, the defendant knew the representation was false, the defendant intended to deceive plaintiff, plaintiff acted in reliance on the truth of the representation and was justified in so relying, the representation was a proximate cause of the plaintiff's damage, and the amount of damage. Iowa Civil Jury Instruction 810.1. Fraudulent misrepresentation can also occur when a party fails to disclose material facts to another party. *Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987). The party must be under a duty to disclose such facts for the failure to be actionable, however. *Id.*

Plaintiffs maintain that Defendant's knowledge of the presence of congenital tremors in its swine herds created an "inequality of condition and knowledge" between the parties, thus creating a duty to inform Plaintiffs of the presence of the disease. Even if Defendant's knowledge did create such a duty, Plaintiffs' argument fails because Defendant did disclose the presence of congenital tremors in its herd. Paragraph 6 explicitly warns Plaintiffs of the presence of "[p]athogens or diseases which have occurred, or which may occur, in DEKALB's swine herds includ[ing]: ... Viral Pathogens: ... congenital tremors virus ..." Thus, Plaintiffs' fraudulent misrepresentation claim fails and Defendant is entitled to summary judgment as to that claim.

Accordingly, **It Is Ordered:**

Defendant's Motion for Summary Judgment is **GRANTED.**