# IN THE COURT OF APPEALS OF IOWA

No. 19-1799
Filed December 16, 2020

**SCHEER AGRI-ENTERPRISES, INC.,**
　　Plaintiff-Appellant,

**vs.**

**LEDGER SWINE FARMS, INC.,**
　　Defendant-Appellee.

_____

Appeal from the Iowa District Court for Iowa County, Patrick R. Grady, Judge.

Scheer Agri-Enterprises, Inc. appeals from the entry of summary judgment in favor of Ledger Swine Farms, Inc. **REVERSED AND REMANDED.**

Benjamin G. Arato and Steven P. Wandro of Wandro & Associates, PC, Des Moines, for appellant.

William H. Roemerman of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellee.

Heard by Bower, C.J., and Vaitheswaran and Greer, JJ.

**BOWER, Chief Judge.**

Scheer Agri-Enterprises, Inc. (Scheer) sued Ledger Swine Farms, Inc. (Ledger) related to the purchase of a group of pigs which were infected with a highly contagious disease. The district court entered summary judgment for Ledger based on the terms of a written contract. Scheer appeals, asserting the court erred in concluding the parties did not have a valid and enforceable oral contract and that Scheer could not recover under a theory of negligence.

Because genuine issues of material fact remain, the district court erred in granting summary judgment to Ledger.

**I. Undisputed Facts.**

Porcine Reproductive and Respiratory Syndrome (PRRS) is a highly contagious viral infection that can move through the air. PRRS can be detected through laboratory tests of swine bodily fluids. The fluids typically tested are blood and saliva. Blood samples are drawn by a veterinarian. Saliva can be collected by veterinarians or barn operators. Saliva samples are collected by hanging a short length of soft cotton rope in pig pens. The pigs naturally chew the rope and, after a short time, a saliva sample can be squeezed from the rope. Local veterinarians do not have the facilities to test fluid samples for PRRS. The samples in this case were all tested at the Veterinary Diagnostic Laboratory at the Iowa State University College of Veterinary Medicine.

Veterinarian access to confinement swine facilities is limited for biosecurity purposes.[1] Biosecurity practice provides that no one may enter a swine

---

[1] Scheer testified biosecurity involves "[t]aking steps to prevent outside pathogens f[rom] coming into your units."

confinement facility if he or she has been inside another swine facility during the two previous days. Despite this limited access, pigs to be transported must have health papers signed by a veterinarian based on an inspection within the prior thirty days. Because of this requirement, commercial swine facilities of the type here are typically inspected every thirty days. These inspections are scheduled far in advance so the veterinarian can coordinate visits and also maintain the two-day separation between facilities. These thirty-day inspections include a physical examination for PRRS symptoms (runny noses or coughs) and the extraction of fluids for laboratory testing.

When swine breeding stock is moved from one facility to another, the recommended biosecurity practice is that the animals are isolated and observed for disease for thirty days before being mixed with other stock.

Scheer is a Missouri farming company that owns a swine "farrow-to-wean" operation it calls the "High Gate facility." This is an enclosed confined animal facility in Missouri south of St. Louis.[2] The interior of this facility is not divided by walls so air moves freely to and among all the animals in the facility. Scheer's High Gate facility produces around 60,000 pigs per year. In 2017, Scheer was interested in increasing the size of the herd.

---

[2] Scheer described the facility's biosecurity measures:

> Our facility at High Gate would be a shower in, shower out facility, traffic control. We are very isolated, so we maybe have less susceptibility than a unit that was located in Iowa, for instance, for traffic, be it trucks, what have you. In our particular unit we process all the feed onsite, so the only trucks that enter the site really are our trucks that haul bean meal or corn into the unit.

Ledger is an Iowa business that sells swine breeding stock. Topigs Norsvin is the owner of a certain genetic strain of swine breeding stock. Ledger sold animals containing the Topigs genetic material under a licensing agreement with Topigs.

In the fall of 2017, Walter Scheer, president of Scheer, contacted Randy Leete, a sales representative of Topigs, and asked about the purchase of gilts[3] to use as breeding stock. Terms of the sale were discussed. During the discussions with Leete, Scheer conveyed he intended to introduce the gilts directly into the High Gate facility without a thirty-day isolation. For that reason, he requested that a PRRS test be conducted on the gilts before each shipment. Leete referred Scheer to Ledger.

*Scheer and Ledger agree on purchase of 1050 gilts.*

Scheer and Ledger negotiated the sale of 1050 gilts to be delivered over between December 2017 and February 2018. Ledger informed Scheer the sale of the gilts would be subject to a "Genetic Supply Agreement." Ledger agreed to conduct a saliva test prior to each shipment unless the shipment occurred following a scheduled monthly veterinarian visit. For the shipments following a veterinarian visit, the parties would rely on the blood test conducted by the veterinarian.

A December 8, 2017 Topigs Norsvin Customer & Sales Order Form completed by Ledger or his wife for Scheer's purchase of Topigs gilts notes, in part:

> Will do an oral fluids test on gilts week of delivery.
> Pricing
> Pricing for Gilts: Gilts under 24 weeks deduct $5.00/hd/wk

---

[3] Gilts are young female pigs that have not yet been bred.

Additional Comments: Will work out plan to shuttle gilts to Sheer trailer. Will be minimal shuttle fee based on arrangement.
Check at time of gilt delivery/pickup. LSF will issue invoice prior to delivery/pickup.

On December 11, in preparation for the first delivery, a saliva sample was collected from the gilts Ledger was to deliver. The sample was tested and found to be negative for the presence of the PRRS virus. Ledger personally delivered the pigs, and while at High Gate, he retrieved the signed Genetic Supply Agreement and purchase agreement, which had been left at the facility.

On December 15, 2017, the day before the first delivery of gilts, Ledger emailed the Genetic Supply Agreement to Scheer. Scheer told Ledger he would sign the Genetic Supply Agreement and leave it in a pickup at the High Gate facility where the gilts were to be delivered. Scheer looked at the Genetic Supply Agreement before signing it on December 16. As arranged, he left the agreement in the pickup truck to be retrieved by Ledger.

On December 20, the Ledger facility had its monthly veterinarian visit. The veterinarian drew blood samples and collected the saliva samples for PRRS testing and forwarded the samples to the Iowa State lab.

On December 21, Scheer's truck and driver were scheduled to be in Iowa to deliver weaned pigs raised at the High Gate facility. Scheer proposed to Ledger the second set of gilts could be loaded onto Scheer's truck after that delivery was complete. When Scheer's truck arrived at the Ledger facility, the gilts were loaded and the truck left for Scheer's Missouri facility. Later that day, Ledger's veterinarian called Ledger and orally notified him that the December 20 sample had been read by the laboratory as positive for the presence of PRRS. Ledger

called Scheer and told him the pigs had tested positive for PRRS. Scheer advised Ledger the pigs had just been unloaded. The pigs were reloaded onto the truck that same day and were hauled to an isolated area where they were left on the trailer.[4]

The High Gate facility suffered a PRRS outbreak.

*Written contract provisions.*

On December 16, 2017, Walter Scheer in his capacity as president of Scheer Agri-Enterprises Inc. signed two documents—the Genetic Supply Agreement and a Ledger Customer & Sales Order Form. The Ledger Order Form specifies the number of pigs to be sold, the price to be paid and some details of the delivery. With regard to the transportation requirements, boxes in front of "Shuttle" and "Back up to the Barn" were marked with an "X"—the box in front of "Isolation" was not. The sales form also states, immediately above the signature line, "I, the undersigned, wish to purchase these animals subject to the terms and conditions of sale as has been presented to me by Ledger Swine Farms."

The following provisions are included in the "Genetic Supply Agreement":

**V. CONDITIONS OF SALE:** The Conditions of Sale, set out below, govern all sales by LSF[5] to Customer and Customer's use of products purchased from LSF:

**A. WARRANTIES OF LSF REGARDING THE SALE OF ANIMALS**
    1. Animals supplied under these Conditions of Sale have been inspected and certified in accordance with applicable federal and state animal health regulations.
        . . . .
**B. WARRANTIES OF CUSTOMER:** Customer warrants that Customer will use the animals purchased under this Agreement only in Customer's own herds, and on Customer's own animals.

---

[4] Ledger picked up the trailer the next day and took the pigs for slaughter.
[5] Ledger Swine Farms.

Customer will not use, sell or transfer the animals purchased under this Agreement for the production of pigs to be used by Customer or any other person or entity as breeding animals or for sale as breeding animals. Customer will not use, sell or transfer the progeny of the animals purchased under this Agreement except for slaughter. . . .

**C. ISOLATION AND ACCLIMATIZATION OF ANIMALS**

1. Customer will completely isolate all animals in a clean facility, physically separate from other swine for at least thirty (30) days, will follow the recommendations of a licensed veterinarian for isolation and for release of animals after the isolation period, and will not begin acclimatization procedures for thirty (30) days after delivery. LSF encourages Customer to test animals, at Customer's expense, for pathogens or disease that are of concern to Customer while animals are in isolation.

2. Customer will acclimatize animals in a separate facility alongside existing stock for at least thirty (30) days after isolation, and will follow the recommendations of a licensed veterinarian for the release of animals from acclimatization.

Customer agrees and understands that LSF will have no duty to audit Customer for animals due to the presence of infectious agents unless Customer complies with the isolation and acclimatization processes set forth herein.

. . . .

**E. LIMITATION OF LIABILITY.** LSF's liability for losses due to economically significant infectious agents, whether transmitted by or through semen or otherwise, or due to advice and information given by LSF, whether oral or written, or due to LSF's breach of any warranty or due to any other cause in respect of Animals or Semen will be limited to the credit procedure in the manner provided in Section D (Credits and Procedure). **LSF will not be liable for incidental or consequential damages, including, without limitation, veterinarian's fees, lost profits, loss of anticipated savings, or other incidental or consequential damages of any nature.**

. . . .

**H. DISEASE STATEMENT.** Customer is experienced in swine breeding, and knows that organisms which cause swine diseases (called pathogens) are present in virtually every swine herd, including LSF's swine herds, and in semen. New or different pathogens or diseases may arise at any time (See also LSF's Isolation and Acclimatization recommendations, which identify pathogens for which LSF administers vaccines). The outbreak of diseases however is caused by many factors in addition to the presence of pathogens within an animal, a swine herd, or semen. Although LSF attempts to minimize the presence of pathogens and diseases in its her[d]s and in the swine breeding stock it sells, **LSF**

8

**CANNOT AND DOES NOT WARRANT THE ABSENCE OF ANY PATHOGENS OR DISEASE IN THE ANIMALS SOLD BY LSF. PATHOGENS OR DISEASES MAY BE PRESENT AT TIME OF SALE OR MAY APPEAR LATER.**

**I. DISCLAIMER OF OTHER WARRANTIES.** This agreement contains all of the warranties made by LSF to Customer. No other warranties, expressed or implied are given. Except as otherwise set out in this Agreement, all animals sold under this Agreement are sold "AS IS". **LSF SPECIFICALLY GIVES NO WARRANTY TO MERCHANTABILITY, HEALTH, OR FITNESS FOR A PARTICULAR PURPOSE EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT.**

LSF specifically disclaims any warranty of the genetic make-up of animals, the performance of animals, or the characteristics or performance of the progeny of animals, except as otherwise set out in this Agreement. **There are no warranties that extend beyond this Agreement.**

. . . .

**K EXCLUSIVE REMEDY. CUSTOMER'S REMEDY OF CREDIT FOR THE INVOICED COST OF AN ANIMAL, LESS SLAUGHTER VALUE, AS PROVIDED IN SECTION D, "CREDITS AND PROCEDURES," OF THIS AGREEMENT, IS THE EXCLUSIVE REMEDY AGAINST LSF AND TOPIGS NORSVIN FOR ANY CLAIM ARISING OUT OF THE PURCHASE OF ANIMALS FROM LSF BY CUSTOMER. ALL OTHER REMEDIES, WHETHER UNDER STATUTE, REGULATION, CONTRACT, TORT, WARRANTY, NEGLIGENCE, OR ANY OTHER LEGAL THEORY OF ANY NATURE, ARE EXPRESSLY WAIVED BY CUSTOMER. CUSTOMER IS AWARE OF THE RISKS OF SWINE PRODUCTION AND THEREFORE THIS WAIVER IS NEITHER UNREASONABLE NOR UNCONSCIONABLE.**

. . . .

**N. ENTIRE AGREEMENT. THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES REGARDING THE MATTERS CO[V]ERED BY THIS AGREEMENT, AND SUPERSEDES ALL OTHER AGREEMENTS, REPRESENTATIONS, OR NEGOTIATIONS BETWEEN OR BY THE PARTIES HERETO, WHETHER ORAL OR WRITTEN, REGARDING SUCH MATTERS. THIS AGREEMENT MAY NOT BE AMENDED EXCEPT BY A WRITTEN DOCUMENT SIGNED BY BOTH PARTIES. CUSTOMER ACKNOWLEDGES THAT CUSTOMER HAS READ AND UNDERSTANDS THIS AGREEMENT AND ANY SCHEDULES ATTACHED TO THIS AGREEMENT, AND THAT CUSTOMER IS ENTERING INTO THIS AGREEM[ENT] VOLUNTARILY AND NOT IN RELIANCE ON ANY REPRESENTATION OF LSF EXCEPT AS HEREIN PROVIDED.**

**CUSTOMER AGREES, BY SIGNING BELOW, THAT LSF HAS GIVEN CUSTOMER NO PROMISES, WARRANTIES, GUARANTEES, OR REPRESENTATIONS EXCEPT AS SPECIFICALLY STATE[D] IN THIS AGREEMENT. TOPIGS NORSVIN PROVIDES NO WARRANTIES FOR ANY TOPIGS NORSVIN GENETICS ACQUIRED BY CUSTOMER FROM LSF.**

On July 2, 2018, Scheer sued Ledger, alleging breach of oral contract for failure to abide by the testing requirements the parties agreed upon. In an amended petition, Scheer also brought a claim for negligence, contending Ledger had violated industry standards by releasing the gilts prior to receiving the test results.

Ledger filed a motion for summary judgment on the following bases:

> (a) The breeding stock was sold pursuant to a valid written contract that sets forth upon its face that there are no agreements between the parties other than those set out in the writing. As a matter of law, the parol evidence rule renders it impossible for the plaintiff to prove or enforce an oral contract.
> (b) The parties' written contract explicitly disclaims all implied warranties. The disclaimer of implied warranties is in writing, conspicuously displayed, and in the form specified by Iowa Code [section] 554.2316(2). As a matter of law there were no implied warranties to breach.
> (c) This case arises from the sale of goods as defined by the Iowa Uniform Commercial Code. This is a case of "disappointed expectations." The Plaintiff expected to receive breeding goods to use as efficient producers of baby pigs. Instead the Plaintiff received pigs infected with a pathogen which made them a less efficient means of production. When the loss arises from the failure of the goods to perform as expected, the buyers remedy is solely in contract. As a matter of law, tort remedies are not available.
> (d) The Plaintiff claims only consequential damages. The parties' contract explicitly bars recovery of consequential damages. The disclaimer of warranties conforms to the requirements of the Iowa Uniform Commercial Code [section] 554.2316(2).

Scheer resisted, asserting the parol evidence rule does not bar the oral contract of the parties, the oral agreement of the parties related to services, not goods, and thus the UCC provisions cited were inapplicable, and based on the

unique facts of the case a negligence case should be permitted. Scheer submitted the written report of its expert Dr. Paul Armbreacht which stated in part:

> Producer agreed to take breeding stock from supplier and supplier agreed to provide animals according to accepted standards in the swine industry and the requirements for Interstate delivery of said animals.
> . . . .
> The supplier had known that the producer did not have an isolation facility to segregate the incoming shipment from the main herd.
> It is my opinion that the supplier failed to prevent the introduction of PRRS virus to producer's herd in [two] points: (1) shipment of animals was done prior to laboratory results being provided, and, (2) knowing that the producer did not have isolation, failed to use increased caution to prevent the transmission of PRRS to producer.
> Based on my [forty-six] years of experience in the veterinary business with an emphasis on swine production, it is also my opinion that in a situation such as this—where a supplier is awaiting test results prior to shipment—it is the normal and expected practice in the swine industry that no movement of the animals occurs until, the test results are received.

No arguments were heard by the court, which may have outlined the issues further. Rather, the district court determined there was no consideration for an oral agreement; rejected Scheer's assertion the oral contract was for services; and held the written agreement was fully integrated, a negligence claim was not available under the written contract, and Ledger was entitled to judgment as a matter of law.

Scheer appeals.

**II. Scope and Standard of Review.**

"We review the district court's grant of summary judgment for correction of errors at law." *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019). Summary judgment is appropriate only when the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ.

P. 1.981(3). "We view the summary judgment record in a light most favorable to the nonmoving party." *Hedlund*, 903 N.W.2d at 715. "The court must also consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record. Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." *Id.* (citations omitted).

**III. Discussion.**

*A. Lack of consideration for oral agreement.* On appeal, Scheer first objects to the district court raising the issue of consideration for an oral contract of its own accord. Scheer maintains it had no notice that lack of consideration was at issue and no opportunity to address the court's concern. Scheer notes that failure of consideration is an affirmative defense which must be pled. Because Ledger never asserted such an affirmative defense, Scheer contends it was improper for the district court to reject the existence of an oral contract on this basis.[6]

The existence of an oral contract, its terms, and whether it was breached are ordinarily questions for the trier of fact. *Dallenbach v. MAPCO Gas Prods., Inc.*, 459 N.W.2d 483, 486 (Iowa 1990).

Ledger did not move for summary judgment on grounds that there was no consideration for the asserted oral contract. Because the court granted summary judgment on a ground not raised—and of which Scheer was given no notice—it erred. *See Zech v. Klemme*, No. 10-1969, 2011 WL 2556080, at *5 (Iowa Ct. App. June 29, 2011) ("[E]ven if we wanted to recognize a district court's ability to enter

---

[6] Ledger responds this principle is only applicable in the case of written contracts. We need not address Ledger's assertion.

summary judgments sua sponte on issues not raised by the parties, we could not do so here because the district court did not notify [non-moving party] of its intent to rule on the causation issue.").[7]

*B. Parol evidence rule.*  Ledger asserted it was entitled to summary judgment because "[a]s a matter of law, the parol evidence rule renders it impossible for the plaintiff to prove or enforce an oral contract."

A general rule of contract is, "When an agreement is fully integrated, the parol-evidence rule forbids the use of extrinsic evidence introduced solely to vary, add to, or subtract from the agreement." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011). "When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated." *Id.* "Determining whether an agreement is fully integrated is a question of fact, to be determined from the totality of the evidence." *Id.*

Here, the district court concluded, "[E]ven if there had been an oral contract, it was superseded upon Scheer's signing of the [Genetic Supply] Agreement." Scheer contends the district court erred in concluding the Genetic Supply Agreement was a fully integrated agreement, referring to Ledger's actions.

"The presence of an integration clause is one factor we take into account in determining whether an agreement is fully integrated." *Wolfe*, 795 N.W.2d at 85. "[E]xtrinsic evidence may be admitted to show that a writing is not an integrated agreement, not completely clear and unambiguous as to the subject in dispute, or

---

[7] The burden is on the party moving for summary judgment to show absence of any genuine issue of a material fact. Iowa R. Civ. P. 1.981(3). In *Zech*, this court noted the moving party did not address the causation and thus "did not carry this burden." 2011 WL 2556080, at *5.

ambiguous with respect to the subject of the lawsuit."[8] *Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 433 (Iowa 1984).

"The parol evidence rule should not be invoked to prevent a litigant the chance to prove a writing does not, in fact, represent what the parties understood to be their agreement." *First Interstate Equip. Leasing of Iowa, Inc. v. Fielder*, 449 N.W.2d 100, 103 (Iowa Ct. App. 1989).

---

[8] Similarly, the Uniform Commercial Code provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (1) by course of performance, course of dealing, or usage of trade (section 554.1303); and
>
> (2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Iowa Code § 554.2202 (2017).

> Comments to the statutory provision explain further:
>
> Paragraph [1] makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.
>
> Under paragraph [2] consistent additional terms, not reduced to writing, may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms.

*Id.*

The summary judgment record establishes Ledger typically only tested his herd for diseases once a month. Yet, he agreed to additional testing here. Gary Ledger testified at deposition:

> So at that time we discussed—we normally have the veterinarian inspection once a month, and then we do oral fluids testing, which we take, and then also do serology of all of our locations, every room of pigs get sampled every month with a total vet inspection.··So I then offered—we discussed the possibility of doing oral fluids testing of the weeks that we were going to ship gilts to Mr. Scheer if it was opposite of where we were not having the vet bleed. *So we agreed to that, we agreed that that would be the protocol we would use, and that's what we did.*

(Emphasis added.) Ledger picked up the signed Genetic Supply Agreement when he delivered the first load of gilts. The next week, Ledger continued to abide by his oral promise to test the gilts the week of delivery. Ledger testified:

> Q. Okay. That's what I'm getting at. You've got your protocol, but how do you—It sounds like in this instance you are saying you were aware you didn't have test results back when the shipment went out?
> A. The difference is here this was specific to this particular situation. On a routine basis, the monthly serum and the monthly oral fluids that we get every month, we would not ship until those were in, *but these were in addition to that.* We were going beyond that, and so that's why we weren't as concerned—I mean, that's why on a normal routine monthly basis we would not, would not ship. *But the fact is that we were sampling every week now*, and we just had negative samples. We had a full vet inspection the day before, there was no indications—because these were way beyond normal protocols, and that's just not my protocols, that's industry protocols . . . .

(Emphasis added.) We agree with Scheer that there remain genuine issues of material fact as to the existence of an oral agreement and whether Ledger breached that agreement.

*C. Contradictory terms.* The district court also ruled an oral contract could not be established because "the alleged oral contract is so completely contradictory to the risk assignment that was a key part of the written contract."

The court also found "Ledger could not warrant the absence of PRRS in any event." Scheer did not allege Ledger agreed to warrant the absence of PRRS; rather it asserts there was an oral agreement to test the gilts for PRRS and not deliver the swine until results are received.

Ledger argues this is an attempt to "alter the allocation of risk set forth in the parties' written contract." Unlike the district court, we are not persuaded the trial court decisions cited by Ledger support summary judgment here.[9] Scheer acknowledges the written contract provides Ledger "cannot and does not warrant the absence of any pathogens or disease in the animals sold" and objects to Ledger's characterization that Scheer expected to purchase "PRRS free" gilts.

Rather, Scheer observes the parties had an oral agreement that Ledger would test for PRRS the week before delivery, which would make Scheer's inability to isolate the swine less of a concern:

> If the results are negative, but PRRS is later discovered in the gilts after delivery, the written contract dictates that Scheer bears the risk. Alternatively, if the test results are wrong or inaccurate, Ledger still wouldn't bear the burden of guaranteeing the accuracy of the test under the written contract. The only requirement was that he make the perfectly reasonable effort of testing the pigs and obtaining the results prior to shipment. This does not shift the risk to Ledger, who can continue to assert that he does not warrant the absence of pathogens or disease in the gilts, despite testing.
> The district court erred in finding that the terms of the oral contract did not harmonize and in fact conflicted with the terms of the written contract. Particularly when Scheer is to be given every

---

[9] *Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc.*, 897 F. Supp. 1472, 1477 (S.D. Ga. 1995) (applying Georgia law and dismissing fraud claim and concluding reliance on an alleged statement that the swine were "PRRS free" was unjustified in light of the written contract terms under which buyer "acknowledged and assumed the risk that the swine it purchased from DEKALB might carry certain pathogens such as PRRS"); *see also Brunsman v. DeKalb Swine Breeders, Inc.*, 952 F. Supp. 628, 630–35 (N.D. Iowa 1996) (rejecting various breach of warranty claims by buyer of boars found to have a congenital tremors condition).

legitimate inference, the district court should have found that there was no conflict between the obligation of Ledger to test the gilts and Ledger's disclaimer of warranty for the accuracy of the test results.

In its reply brief, Scheer adds:

Scheer's "bet" as Ledger describes it, wasn't that he thought he could get away without quarantining the gilts. Rather, Scheer's "bet" was that he could trust Ledger to do as he promised and test the gilts prior to delivery. If Ledger did that, Scheer wagered, the risk of an outbreak would be lowered to an acceptable level.

We conclude Scheer has the better argument. We stress that we are not making any determination on the merits of Scheer's claims, only that the district court prematurely rejected all Scheer's claims and erred in granting summary judgment at this juncture.

Because the district court improperly concluded there could be no showing of an enforceable oral agreement, we reverse and remand for further proceedings.

**REVERSED AND REMANDED.**

Vaitheswaran, J., concurs; Greer, J., concurs in part and dissents in part.

**GREER, Judge** (concurring in part and dissenting in part).

I agree with the majority's conclusion that it was premature to grant summary judgment on the oral contract claim raised by Scheer Agri-Enterprises, Inc. (Scheer). Out of the mouth of Ledger Swing Farms, Inc. (Ledger), words might have established an oral promise by Ledger to test the hogs for Porcine Reproductive Respiratory Syndrome (PRRS) before delivery to Scheer. But where I stray from the majority's well-written opinion is that I would find that the terms of the subsequent written Genetic Supply Agreement (GSA), signed by businessmen sophisticated in the agricultural arena, defines the remedies and damages sought by Scheer. To avoid a summary ruling, Scheer offered no material facts, including any oral negotiations, which operate to avoid applying the written contract terms involving limitations of liability.

In his petition, Scheer alleged breach of an oral agreement by Ledger because of Ledger's failure to timely test and report the test results. There are good reasons to allow Scheer to develop the oral contract claim to see if it survives. Scheer tackled the oral contract issue from several fronts. First, Scheer argued the GSA should be reformed to conform to the parties' intentions. *See Kufer v. Carson*, 230 N.W.2d 500, 504 (Iowa 1975) ("The writing will be reformed only if the party seeking reformation clearly and convincingly establishes the writing does not express the true agreement of the parties because of fraud, duress, mutual mistake of fact, mistake of law, mistake of one party, and fraud or inequitable conduct on the part of the other."). Next, Scheer contends that "following the signing of the contract, Ledger continued to perform testing, which under the written terms he had no obligation to do," shows the pair had "subsequent

negotiations" modifying the GSA. *See Gordon v. Witthauer*, 138 N.W.2d 918, 921 (Iowa 1966) (providing that an oral agreement accepted and acted upon by parties may alter or modify written contract). Finally, he suggested the oral agreement was a contract "separate and distinct from the written agreement." *See Garland v. Brandstad*, 648 N.W.2d 65, 69 (Iowa 2002) (noting parol evidence may be admissible to prove the existence of an independent oral contract). Now in his appellate brief, to avoid the lack-of-consideration argument, Scheer suggests the oral agreement to test was an inducement required for him to sign the GSA. *See I.G.L. Racquet Club v. Midstates Builders, Inc.*, 323 N.W.2d 214, 216 (Iowa 1982) ("The rule should not be employed to preclude a party from attempting to show the writing was induced in part by an oral agreement."). With these confusing and somewhat contradictory positions of Scheer, Ledger maintained that the parol evidence rule barred evidence of any claimed oral contract—however Scheer frames it.

Under this record we have to reconcile Ledger's description of what he offered Scheer before the written contract was signed. Ledger clarified:

> The discussion we had at that point in time was what was our normal blood testing protocol. We discussed that, and so the discussion was—and really what it really centered around was this whole situation of concern with no isolation became a concern, and so at that point then we discussed, okay, what could we do to help that feel like—you know, that situation be comfortable, even though, you know, I didn't agree with it, that that was our protocol, is isolation, that's just part of the protocol. So at that time we discussed—we normally have the veterinarian inspection once a month, and then we do oral fluids testing, which we take, and then also do serology of all of our locations, every room of pigs get sampled every month with a total vet inspection. *So I then offered—we discussed the possibility of doing oral fluids testing of the weeks that we were going to ship gilts to Mr. Scheer if it was opposite of where we were not having the*

*vet bleed. So we agreed to that, we agreed that that would be the protocol we would use, and that's what we did.*

(Emphasis added.) So given this testimony of Ledger, the oral contract question remains unanswered at this early stage of the case.

Still, Scheer did sign a written contract following the claimed oral testing protocol agreement. The terms of the GSA contained an integration clause. An agreement is fully integrated when the parties involved adopt a writing or writings as the final and complete expression of the agreement. *Montgomery Props. Corp. v. Economy Forms Corp.,* 305 N.W.2d 470, 476 (Iowa 1981). "When applicable, the parol evidence rule excludes extrinsic evidence which is solely offered for the purpose of varying, adding to, or subtracting from a *written* agreement." *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984) (emphasis added); *see also* Restatement (Second) of Contracts § 215 (Am. Law. Inst. 1981) ("[W]here there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing."). The goal of the parol evidence rule is "to prevent fraud and prevent contracting parties from being charged with agreements not in fact made." *Gordon*, 138 N.W.2d at 920.

The GSA terms are not ambiguous. This two-page written agreement contained strict language regarding limitations of liability, warranties, remedies, and, as noted, an integration clause. The parties to the written agreement were knowledgeable about the hog industry and risks associated with disease. Scheer testified he read the written contract, understood it, and signed it. Although the GSA terms limited his rights, Scheer confirmed:

Q. All right. You agree you had a chance to read it? A. Uh-huh. Yes.

Q. All right. Since this dispute has come up, have you read it? A. Yes. It hasn't changed.

Q. No, I understand that. I was going to ask you, when you read it at any time, was there any part of it that you read it and said I don't know what that means? A. No.

Q. You feel like you understood it? A. Yeah, I understood it. It was standard. It was *standard industry warble*.

Q. When you say warble, did you understand you were agreeing to the terms of that when you took delivery of those pigs? A. Yes.

Q. Just above your signature it says, quote, I, the undersigned, wish to purchase these animals subject to the terms and conditions of sale as has been presented to me by Ledger Swine Farms. Did you understand that the genetic supply agreement was part of the terms? A. Yes.

(Emphasis added.) Despite the "standard industry warble," Scheer signed the GSA, admitting he had to before Ledger would give him pigs. *See Montgomery Props.*, 305 N.W.2d at 475–76 (holding where the handcrafted contract contains an integration clause, when the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the exchange agreement, there was no error when court sustained parol evidence rule objection and excluded evidence to vary its terms). The GSA restricted Ledger's liability, and there is no evidence any expansion of that liability was ever discussed, modified, or reformed by prior or later negotiations between Ledger and Scheer. All we have before us is a written agreement signed by a sophisticated hog man with limitations of liability that, according to Scheer, are standard in the industry.

Under the heading "The terms of the oral contract do not alter the allocation of risk between the parties," Scheer argues in his appellate brief that "[a] contract should be construed so as to give effect to all the contract's provisions . . . if two

clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a harmonious interpretation to the clauses in order to avoid rendering either one nugatory." *McLeodUSA Telecomms. Servs., Inc. v. Iowa Utils. Bd.*, 550 F. Supp. 2d 1006, 1028 (S.D. Iowa 2008) (quoting *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 374 (8th Cir. 1983)). I agree with this premise. But Scheer's problem is that he can only point to a conflict between an oral agreement to test and the GSA terms indicating Ledger had no responsibility to test. Scheer offers no conflicting language to rebut the GSA's other written terms. While there may be ambiguity about the testing terms, there is no ambiguity about other terms in the contract. "Because a contract is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991). "The interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no effect." *Smith Barney, Inc. v. Keeney*, 570 N.W.2d 75, 78 (Iowa 1997) (citing *Iowa Fuel*, 471 N.W.2d at 863).

After agreeing to the terms about the testing and reporting, viewing the facts in the light most favorable to Scheer, he then signed the GSA agreeing that he understood the terms of the GSA. "In order to successfully resist a motion for summary judgment, the resisting party must set forth specific evidentiary facts showing the existence of a genuine issue of material fact. The party may not rest on mere allegations . . . ." *Liska v. First Nat'l Bank*, 310 N.W.2d 531, 534 (Iowa Ct. App.1981) (citations omitted). Specifically, paragraph E of the GSA clarified the undisputed limitation of liability as follows:

> [Ledger's] liability for losses due to economically significant infectious agents, whether transmitted by or through semen or otherwise or *due to advice and information given by [Ledger], whether oral or written due to [Ledger's] breach of any warranty* or due to any other cause in respect of animals or semen *will be limited to the credit procedure in the manner provided in section D* ("Credits and Procedure"). [Ledger] will not be liable for incidental or consequential damages, including without limitation, veterinarian's fees, lost profits, loss of anticipated savings, or other incidental or consequential damages of any nature."

(Emphasis added.) So I would find that the ruling as to warranties, limitations of liability, exclusive remedies, and presumably the other paragraphs referencing subjects unrelated to the testing requirement would still apply. We strive to give effect to all the language of a contract, the most important evidence of the contracting parties' intentions. *See Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 26 (Iowa 1978).

I would reverse the district court summary judgment ruling on the oral contract claim. Because the GSA trumps all other claims asserted by Scheer, I would grant summary judgment on all of the other claims and find Scheer bound by the contract he signed in all other respects.